STATE BAR GRIEVANCE ADMINISTRATOR v JAQUES

Docket No. 58697. Argued March 2, 1977 (Calendar No. 8).—Decided October 24, 1977. Rehearing denied 402 Mich 955. Judgment order stayed by the Supreme Court of the United States pending action on appeal March 31, 1978.

Leonard C. Jaques was suspended from the practice of law for three years by the State Bar Grievance Board for soliciting employment by victims and survivors of a tunnel explosion at Port Huron. The respondent appeals. *Held:*

1. Discipline and disbarment proceedings have been recognized as quasi-criminal in character. Therefore, the Supreme Court has imposed some of the same safeguards applied in criminal proceedings to grievance procedures for the protection of attorneys faced with charges of professional misconduct. However, the State Bar Grievance Board is a part of the administrative structure of the Court and the State Bar Rules are liberally construed for the protection of the public, the courts, and the legal profession. An attorney whose privilege to practice law is at stake is entitled to a full and fair hearing, but due process does not require application of the law of criminal trials at every turn.

2. The hearing panel erred in receiving and considering as substantive evidence the edited transcript of testimony taken at an earlier hearing before another hearing panel, which was disqualified from deciding the complaint. The demeanor of the witnesses in a case may be an important factor in the resolution of disputed facts. Therefore, absent an agreement to the contrary, a hearing panel to which a case is reassigned may not simply consider the record and resume the hearing where the former panel stopped. The findings that were based on testimony not heard by the second panel were reversed.

REFERENCES FOR POINTS IN HEADNOTES

[1] 7 Am Jur 2d, Attorneys at Law § 12 *et seq.*

[2] 16 Am Jur 2d, Constitutional Law §§ 545–547.

[3–9, 19] 7 Am Jur 2d, Attorneys at Law §§ 17, 64, 66.

[10–18] 7 Am Jur 2d, Attorneys at Law §§ 40–43.

[13] 7 Am Jur 2d, Attorneys at Law § 43.

Advertising by attorney as ground for disbarment, suspension, or other disciplinary action. 39 ALR2d 1055.

[20, 21] 81 Am Jur 2d, Witnesses §§ 663–666.

3. The State Bar Grievance Administrator does not have the duty to call res gestae witnesses in state bar disciplinary proceedings. However, he does have the duty to seek justice and to develop a full and fair record, which was satisfied in the instant case. The respondent was afforded an opportunity to confront and cross-examine all of the witnesses against him. The action of the hearing panel in quashing a subpoena served on counsel for the State Bar Grievance Administrator did not deprive the respondent of a fair hearing.

4. The conduct of the hearing panel was entirely fair throughout the hearing and its members did not improperly examine witnesses. The respondent was not prevented from calling any of the witnesses, or cross-examining any witnesses, or getting important evidence into the record. None of the communications between members of the hearing panel and the State Bar Grievance Administrator resulted in denial of a fair hearing, and the members stated that they had not discussed the merits of the case with counsel.

5. Although a second complaint against the respondent added more explicit detail regarding the charge of solicitation of a class action, the factual allegations of the original complaint were sufficient notice of the charge, particularly when the entire complaint is considered. Similarly, conducting the hearing on the original charges after the respondent withdrew a plea of nolo contendere to lesser charges was not unfair. The policy considerations underlying the prohibition against imposing greater criminal charges after successful appeal of a conviction based on a plea of guilty are not applicable to State Bar disciplinary proceedings.

6. The disciplinary rules adopted by this Court do not tolerate the respondent's initiation of a meeting four days after the tunnel explosion including persons with whom he had no prior professional contact. Although the disciplinary rule permits an attorney to accept employment in a class action from members of a court-approved class, it disapproves personal solicitation by lawyers of specific claims. The findings that the respondent personally solicited an agent and members of the union to join in a planned class action and that he requested that the agent recommend him to persons who had claims arising out of the tunnel explosion are supported by substantial evidence in the record. The kind of solicitation in this case remains the classic example of "ambulance chasing" which exposes the profession and its members to public contempt.

The order of discipline is modified to suspend the respon-

dent's license to practice law for 24 months from the date of the Court's order.

Justice Moody concurred in the analysis and conclusion that the respondent was guilty of unprofessional conduct, but deems the discipline imposed excessive under the circumstances because all evidence relating to direct solicitation of the victims' families has been excluded from the Court's consideration. He would impose a one-year suspension.

Justice Levin, joined by Chief Justice Kavanagh, dissented. He wrote:

1. It is proper under the State Bar disciplinary rules to communicate with "others" to obtain their joinder in a class action. The principal limitation is that a lawyer may not seek employment from persons with whom he communicates; the rule permits him to accept employment from such persons if it is offered. Implicit in the rule is that a lawyer seeking joinder must have a client, but neither the language nor policy of the rule requires that an action have been commenced before solicitation of joinder in that action or in an ancillary action. "Present communications" are permitted if the litigation is in the nature of a class action and the client's success in asserting rights or defenses is dependent on the joinder of others. The hearing panel found that the respondent's purpose in calling the business agent was to solicit the union and others to join in a class action which did not seek a money recovery but simply an investigation. There is no finding that the meeting called by the union's business agent was a pretext and that the real purpose was to solicit the families of victims to employ Jaques on a contingent-fee basis. The respondent may not properly be disciplined for seeking joinder of others in a proposed class action.

2. The only substantial evidence supportive of the finding that the respondent requested the business agent for the local union to recommend him to persons who had claims arising out of the tunnel explosion was the testimony of the respondent's former associate. There is no evidence that the business agent passed out any retainer forms or that he solicited or caused anyone to solicit any of the victims' families. The only proper conclusion on this record is that none of the victims' families were solicited as a result of any effort by the union business agent.

3. The panel relied on testimony of the respondent's former associate, whose credibility was of crucial importance. The respondent's position was that it was the former associate who was guilty of misconduct and that she had agreed to testify

against him to avoid being charged herself. Evidence of a witness's interest or motive for testifying has a direct bearing on credibility. The issue is never collateral. The hearing panel erred in denying the respondent's attorney the opportunity to question counsel for the State Bar Grievance Administrator regarding any discussion or understanding he had with the respondent's former associate about her testimony.

4. The discipline here is excessive and appears to be imposed on the basis of evidence supporting findings that have been set aside. Reducing the discipline to two years suspension cannot, in the light of discipline imposed by other hearing panels and the State Bar Grievance Board, be justified on the findings that are affirmed.

Affirmed as modified.

### OPINION OF THE COURT

1. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—DUE PROCESS.

Disciplinary and disbarment proceedings are quasi-criminal in character; therefore the Supreme Court, for the protection of attorneys charged with professional misconduct, has imposed some of the same safeguards applied in criminal proceedings to grievance procedures, but the law of criminal trials need not be applied to disciplinary proceedings at every turn (Grievance Rule 16.34).

2. CONSTITUTIONAL LAW—DUE PROCESS—WORDS AND PHRASES.

Due process is a term that negates any concept of inflexible procedures applicable to every situation; the court must determine what process is due in a given setting by taking into account the individual's stake in the decision at issue as well as the state's interest in a particular procedure for making it.

3. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—HEARINGS— EVIDENCE—TRANSCRIPTS.

A hearing panel of the State Bar Grievance Board erred in receiving and considering as substantive evidence the edited transcript of testimony before another hearing panel, which was disqualified, where the demeanor of the witnesses may have been an important factor in the resolution of disputed facts and there was no agreement by the parties to allow the second panel to resume the hearing where the first panel had stopped (Grievance Rule 16.3.3[b]).

4. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—HEARINGS— WITNESSES.

A quorum of a State Bar Grievance Board hearing panel, where

conflicting testimony must be resolved in a disciplinary proceeding, must personally hear and observe all the witnesses whose testimony is to be considered unless the State Bar Grievance Administrator properly establishes justification for their non-appearance, as, for example, where a witness is shown to be unavailable and a transcript of his testimony is therefore admissible under the former testimony exception to the hearsay rule (Grievance Rule 16.3.3[b]).

5. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—STATE BAR GRIEVANCE ADMINISTRATOR—WITNESSES—DUTY TO PRODUCE.

Counsel for the State Bar Grievance Administrator has a duty to seek justice and to develop a full and fair record in a disciplinary proceeding, but he is not bound by the rule of criminal law which requires the prosecutor to produce and examine all of the res gestae witnesses unless their testimony would be cumulative (Grievance Rule 16.5.2[b]).

6. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—WITNESSES—COUNSEL.

A State Bar Grievance Board hearing panel did not deprive a respondent attorney of a fair hearing by quashing a subpoena served on counsel for the State Bar Grievance Administrator where the respondent was afforded an opportunity to confront and cross-examine all of the witnesses against him, and the administrator, an assistant administrator and two investigators did testify before the hearing panel.

7. ATTORNEY AND CLIENT—STATE BAR GRIEVANCE ADMINISTRATOR—COMMUNICATIONS WITH HEARING PANEL—DUE PROCESS.

A miscarriage of justice did not result from advice by counsel for the State Bar Grievance Administrator to members of a State Bar Grievance Board hearing panel that the administrator would oppose motions filed by a respondent and by counsel's brief discussion concerning scheduling of hearing dates with one member of the panel, or by a member's hearing that the respondent had served a subpoena on a potential witness, where the members of the hearing panel stated that they had not discussed the merits of the case with counsel.

8. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—AMENDED COMPLAINT—DUE PROCESS.

The addition of a second formal complaint in State Bar disciplinary proceedings which referred to a disciplinary rule not mentioned in the first complaint was not a failure to give notice of the charges which would deprive the respondent of

due process where the factual allegations of the first complaint, taken as a whole, were sufficient notice of the charge, the respondent did not request a more definite statement or a conference to narrow the issues of the first complaint, and the respondent initially argued that the disciplinary rules condoned the conduct described in the first complaint.

9. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—NOLO CONTENDERE—AMENDED COMPLAINT—DUE PROCESS.

Conducting a State Bar Grievance Board disciplinary hearing on the original charges after a respondent withdrew a plea of nolo contendere to lesser charges is not a denial of due process because the policy considerations underlying the prohibition against imposing greater criminal charges after successful appeal of a conviction based on a plea of guilty are not applicable to State Bar disciplinary proceedings.

10. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES—CLASS ACTIONS.

An attorney who, four days after a tunnel explosion, initiated a meeting of persons with whom he had no prior professional contact to solicit them to join in a proposed class action to compel the Coast Guard to investigate the explosion was guilty of unprofessional conduct where no suit had been filed and the meeting was not pursuant to any court-approved notice to members of a class (Code of Professional Responsibility and Canons, DR 2-103[A], DR 2-103[C], DR 2-104[A] [5]).

11. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES.

The State Bar disciplinary rules disapprove as unprofessional personal solicitation by lawyers of specific claims (Code of Professional Responsibility and Canons, DR 2-104[A]).

12. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES.

An attorney who requested that a union agent recommend him to persons who had claims arising out of a tunnel explosion was guilty of unprofessional conduct (Code of Professional Responsibility and Canons, DR 2-103[C]).

13. ATTORNEY AND CLIENT—FIRST AMENDMENT—ADVERTISING—SOLICITATION.

The United States Supreme Court has held that punishment of a lawyer for a truthful newspaper advertisement concerning the availability and terms of routine legal services violates the First Amendment, but the issues of the constitutionality of personal solicitation of clients and the attendant possibilities for the exertion of undue influence, and whether restrictions

could be placed on claims as to the quality of legal services, were not before the Court (US Const, Am I).

OPINION CONCURRING IN PART

BLAIR MOODY, JR., J.

14. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—SOLICITA-
TION.

*An attorney should be suspended from the practice of law for one year under all the circumstances of a particular case for improperly contacting and seeking employment from members of a union to join in a class action to compel the investigation of a tunnel explosion and for asking a union official to solicit clients for him (Code of Professional Responsibility and Canons, DR 2-103[C], DR 2-104[A][5]).*

DISSENTING OPINION BY LEVIN, J.

KAVANAGH, C. J.

15. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES—
CLASS ACTIONS.

*It is proper for a lawyer to communicate with others to obtain their joinder in a class action; the principal limitation is that a lawyer may not seek employment from persons with whom he communicates, but the rule permits him to accept employment from such persons if offered (Code of Professional Responsibility and Canons, DR 2-104[A][5]).*

16. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES—
CLASS ACTIONS.

*A lawyer seeking joinder of others in a class action must have a client, but neither the language nor policy of the rule requires that an action have been commenced before solicitation of joinder in that action or in an ancillary action (Code of Professional Responsibility and Canons, DR 2-104[A][5]).*

17. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES—
CLASS ACTIONS.

*The State Bar disciplinary rules permit presuit communications by a lawyer with others concerning joining a class action; the only limitations are that the proposed litigation be in the nature of a class action and that the success of the attorney's client in asserting such rights or defenses in such litigation is dependent upon the joinder of others (Code of Professional Responsibility and Canons, DR 2-104[A][5]).*

18. ATTORNEY AND CLIENT—SOLICITATION—DISCIPLINARY RULES—
CLASS ACTIONS.

An attorney who had a client when he communicated with a
union's business agent and sought the union's joinder in the
client's proposed class action may not properly be disciplined
for expeditiously seeking the joinder of others in the action,
which was to compel a Coast Guard investigation of an explo-
sion, where a hearing panel of the State Bar Grievance Board
found that the attorney made it clear that those joining in the
class action would not be charged a fee for his services, the
proposed class action did not seek a money recovery, and the
attorney's real purpose was not to solicit the families of victims
of the explosion to employ him on a contingent fee basis (Code
of Professional Responsibility and Canons, DR 2-104[A][5]).

19. ATTORNEY AND CLIENT—DISCIPLINARY PROCEEDINGS—WITNESSES—
CREDIBILITY.

A hearing panel of the State Bar Grievance Board erred in
denying a respondent the opportunity to question counsel for
the State Bar Grievance Administrator regarding any discus-
sion or understanding with a witness where the respondent was
seeking to show that it was the witness, his former associate,
who was guilty of misconduct and that the witness had agreed
to testify against him to avoid professional misconduct charges.

20. WITNESSES—CREDIBILITY—INTEREST.

Evidence of a witness's interest or motive for testifying has a
direct bearing on credibility; the issue is never collateral.

21. WITNESSES—CREDIBILITY—INTEREST.

Agreements regarding the testimony of a witness materially
affect the bias or interest of the witness and should be placed
before the trier of fact; even if there has been no actual
promise of lenience, it is proper to show a belief or even only a
hope of securing favorable treatment, in return for testimony.

*Louis Rosenzweig,* Counsel to State Bar Griev-
ance Administrator, and *Eugene N. LaBelle,* Asso-
ciate Counsel.

*Ralph Goldsmith* and *R. G. Corace, P. C.,* for
respondent.

RYAN, J. Appellant Leonard C. Jaques appeals
as of right the State Bar Grievance Board's order

affirming imposition of a three-year suspension of his privilege to practice law, plus payment of costs ordered by a hearing panel.

The complaints filed against Mr. Jaques by the Grievance Board charged him with violating former Canon 28 of the Canons of Professional Ethics, Canon 2, DR 2-103(A) and DR 2-103(C); DR 2-104(A)(5); and DR 2-105(A) of the Code of Professional Responsibility[1] and Rule 15, § 2(2); 15, § 2(3) and 15, § 2(4) of the Supreme Court Rules relating to the State Bar of Michigan.[2] It was alleged that

---

[1] Canon 2 and the enumerated Disciplinary Rules of the Code of Professional Responsibility associated with it provide as follows:

Canon 2: "A lawyer should assist the legal profession in fulfilling its duty to make legal counsel available."

DR 2-103: "Recommendation of Professional Employment.

"(A) A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a nonlawyer who has not sought his advice regarding employment of a lawyer.

* * *

"(C) a lawyer shall not request a person or organization to recommend employment, as a private practitioner, of himself, his partner, or associate, except that he may request referrals from a lawyer referral service operated, sponsored, or approved by a bar association representative of the general bar of the geographical area in which the association exists and may pay its fees incident thereto."

DR 2-104: "Suggestion of Need of Legal Services.

"(A) A lawyer who has given unsolicited advice to a layman that he should obtain counsel or take legal action shall not accept employment resulting from that advice, except that:

* * *

"(5) If success in asserting rights or defenses of his client in litigation in the nature of a class action is dependent upon the joinder of others, a lawyer may accept, but shall not seek, employment from those contacted for the purpose of obtaining their joinder."

[2] State Bar Rule 15 provides in relevant part:

Sec. 2. "Grounds for Discipline in General.

"The following acts or omissions by a member of bar of this State, individually or in concert with any other person or persons, shall constitute misconduct and shall be grounds for discipline whether or not the act or omission occurred in the course of an attorney-client relationship.

* * *

"(2) Conduct that exposes the legal profession or the courts to obloquy, contempt, censure or reproach;

Mr. Jaques personally and through the employment of others sought to and did solicit victims and survivors of the December 11, 1971 Port Huron tunnel explosion and that he personally urged certain persons to bring a lawsuit to compel an inquiry into the cause of the explosion.[3]

"(3) Conduct that is contrary to justice, ethics, honesty or good morals;

"(4) Conduct that violates the standards or rules of ethics or professional responsibility adopted from time to time by the Supreme Court of this State."

[3] The specific charges on which findings were eventually made were set forth in two complaints. The first formal complaint charged:

"That on or about December 13, 1971, respondent personally arranged to meet Robert J. McLaughlin, Jr., business agent for Local 463 of the Laborers International Union of North America and did so meet with McLaughlin on said day and date for the stated purpose of obtaining McLaughlin's assistance, as an officer of said union, in soliciting the victims and/or survivors of victims of a tunnel explosion at Port Huron occurring December 11, 1971.

"That McLaughlin personally, and as an officer of said union refused to endorse respondent as an attorney recommended to said victims and/or survivors by him or the local union.

"That thereafter, from on or about December 13, 1971 to on or about February 1, 1972, and on frequent occasions in the interim respondent, individually and in concert with Edward Paige and/or William Rounsoville solicited or caused to be solicited the personal and/or derivative claims, and/or contemplated personal and/or derivative claims of the victims and/or survivors of said victims of said explosion, to wit:

(1) Mrs. Johanna Laretz;
(2) Mrs. Maddelin Williams; [sic]
(3) Mrs. Rose Woolstenhulme;
(4) Mrs. Sue Curtis;
(5) Mrs. Maggie Epperson;
(6) Mrs. Judy A. Hardel;
(7) Francis M. Hamricks;
(8) Olin Hamricks, Jr.; and
(9) Joyce Simkins (Mrs.)

"That the foregoing violated Code of Professional Responsibility DR 2-103(C); DR 2-104(A)(5); and DR 2-105(A) and the Supreme Court Rules relating to the State Bar of Michigan."

The second formal complaint alleged:

"That on or about December 15, 1971, respondent met with Robert J. McLaughlin, business agent of Local 463 of the Laborers Union at Port Huron, Michigan, and did, then and there:

"(a) Volunteered advice to said McLaughlin to bring a lawsuit or lawsuits on behalf of said union for the purpose of precipitating an

This case is before us following lengthy proceedings below. A request for investigation and then a formal complaint were served upon Mr. Jaques in the first half of 1972, more than five years ago, following a general investigation of allegations of misconduct arising out of the tunnel explosion. The matter was assigned to Wayne County Hearing Panel No. 17 which heard the testimony of six witnesses. Appellant then offered to plead nolo contendere to charges as amended by an oral stipulation and his plea was accepted. The panel ordered a one-year suspension from practice.

The State Bar Grievance Board eventually set aside appellant's plea and remanded to Hearing Panel No. 17 to complete the formal hearing to the conclusion of the testimony. Two months prior to the filing of the board's order a second request for investigation was served on Mr. Jaques and it was followed by a second formal complaint. The two complaints were consolidated for trial and assigned to Hearing Panel No. 12, Panel No. 17 having disqualified itself. Panel No. 12 was thereafter also disqualified and the case was reassigned to Hearing Panel No. 2. The members of Panel No. 2 were furnished an edited transcript of the testimony and exhibits produced at the earlier, truncated hearing. Panel No. 2 then heard ten more days of testimony during the period between Octo-

---

inquiry into the causes of an explosion in a tunnel being constructed in the vicinity in which members of said union were employed at the time of said explosion;

"(b) Sought to persuade said McLaughlin to act on behalf of respondent to solicit and/or seek out survivors of said explosion and/or next of kin of victims of said explosion for the purpose of employing respondent as their attorney to prosecute any and all compensation or personal injury claims of said victims and/or their next of kin.

"That said conduct is in violation of former Canon 28 of the Canons of Professional Ethics, Canon 2, DR 2-103(A) and (C) of the Code of Professional Responsibility and Rule 15, § 2(2)(3) and (4) of the Supreme Court Rules relating to the State Bar of Michigan."

ber 1974 and May 1975 and entered an opinion and an order of discipline. The State Bar Grievance Board affirmed the findings and modified the order of discipline only as to the amount of costs.

Mr. Jaques appeals the findings below, asserting nine instances of error which raise essentially the following three issues:

1. Whether Mr. Jaques was afforded a fair hearing in accordance with the applicable rules;

2. Whether it is unethical to solicit persons to join in a class action which has not yet been filed; and

3. Whether the findings of misconduct are supported by the evidence.

I

Mr. Jaques claims the hearing afforded him was defective because: Hearing Panel No. 2 merely read the transcripts but did not hear the testimony of witnesses who appeared before Panel No. 17; the State Bar Grievance Administrator did not call all res gestae witnesses to the alleged misconduct; the hearing panel quashed a subpoena of counsel for the State Bar Grievance Administrator, denying appellant's alleged right to call and examine him; the hearing panel did not conduct itself as an impartial arbiter; and, finally, the formal complaint gave insufficient notice of the charges.

Due process is the underpinning of these allegations of error. What we are concerned with, then, is that Mr. Jaques must have been afforded a fair hearing as well as one conducted in accordance with the rules adopted by this Court.

A good deal of appellant's argument is put to us by way of analogy to criminal cases. We have long

recognized that discipline and disbarment proceedings are quasi-criminal in character. *State Bar of Michigan v Woll,* 387 Mich 154; 194 NW2d 835 (1972). In light of that recognition we have imposed some of the same safeguards applied in criminal proceedings to grievance procedures for the protection of attorneys faced with charges of professional misconduct. For example, we have held that the allegedly errant attorney has a right to cross-examine witnesses, *State Bar of Michigan v Murphy,* 387 Mich 632; 198 NW2d 289 (1972), and to be fairly and specifically informed of the charges against him, *State Bar Grievance Administrator v Freid,* 388 Mich 711; 202 NW2d 692 (1972).

It is important, however, to remember that we are dealing with the disciplinary procedures of the State Bar of Michigan. As Justice LEVIN said in concurring in *State Bar Grievance Administrator v Estes,* 390 Mich 585, 602; 212 NW2d 903 (1973), "the Grievance Board is part of the administrative structure of this Court". The State Bar Rules "shall be liberally construed for the protection of the public, the courts and the legal profession". State Bar Grievance Rule 16.34(d).

In the State Bar Rules and in previous cases we have accordingly approved variances between disciplinary proceedings and the rigorous standards applied in the trial of criminal cases. We impose discipline if misconduct is proven by a preponderance of the evidence. *State Bar Grievance Administrator v Jackson,* 390 Mich 147; 211 NW2d 38 (1973); Grievance Rule 16.13. The cases are tried before panels of lawyers and the applicable rules provide that hearings are to be conducted in the same fashion as civil trials in nonjury cases.

It is fundamental that Mr. Jaques, as an attor-

ney whose privilege to practice law is at stake, is entitled to a full and fair hearing. We do not believe, however, that we must apply the law of criminal trials to disciplinary proceedings at every turn.

"Due process * * * is a term that 'negates any concept of inflexible procedures universally applicable to every imaginable situation.' *Cafeteria Workers v McElroy,* 367 US 886, 895 [81 S Ct 1743; 6 L Ed 2d 1230] (1961). Determining what process is due in a given setting requires the Court to take into account the individual's stake in the decision at issue as well as the State's interest in a particular procedure for making it." *Hortenville Joint School Dist No 1 v Hortenville Education Association,* 426 US 482, 494; 96 S Ct 2308; 49 L Ed 2d 1 (1976).

Having said this much, we proceed to consider the individual allegations of error.

### A.

We first hold that the hearing panel erred in receiving and considering as substantive evidence the edited transcript of the testimony of the witnesses who appeared before Panel No. 17. We need go no further than the State Bar Rules to reach this conclusion, although even without the rule our notion of fundamental fairness leads to the same conclusion.

Rule 16 of the State Bar Rules created the State Bar Grievance Board as an arm of this Court for the discharge of our exclusive constitutional duty to supervise the State Bar. Rule 16 and the associated Procedural and Administrative Rules prescribe the conduct of hearings on complaints issued by the State Bar Grievance Administrator. State Bar Rule 16 assigns to hearing panels the

duty of holding public hearings, making findings of fact and ordering discipline, and requires that their actions be reported to the State Bar Grievance Board. Grievance Rule 16.3 provides that two members of the panel constitute a quorum and that action shall be by vote of a majority. Grievance Rule 16.10 allows the board to "reassign a complaint when the hearing panel fails to convene or complete its hearing within a reasonable time".

The Grievance Administrator argued and the hearing panel agreed that when a case is reassigned it is not necessary to hear anew the testimony of witnesses who had appeared at an earlier hearing before the first panel. Under the circumstances present in the instant case, we disagree.

Although the rules contemplate the reassignment of cases, Grievance Rule 16.3.3(b) is also relevant. It provides that hearing panels shall "[r]eceive evidence and make written findings of fact". We believe the directive of Grievance Rule 16.3.3(b) establishes a preference for the hearing panel that makes the initial finding of fact to likewise receive the testimony of witnesses. Where, as in the case at bar, the demeanor of witnesses may be an important factor in the resolution of disputed facts, Grievance Rule 16.3.3(b) controls and, absent an agreement to the contrary, the hearing panel to which a case is reassigned may not simply consider the record testimony of the witnesses who have appeared and resume the hearing where the former panel left off. See generally, 2 Davis, Administrative Law Treatise, § 11.18.

Our holding assures that where conflicting testimony must be resolved, a quorum of a hearing panel will personally hear and observe all the witnesses whose testimony is to be considered unless the Grievance Administrator properly es-

tablishes justification for their non-appearance, as for example where a witness is shown to be unavailable and his testimony is therefore admissible under the former testimony exception to the hearsay rule.

Of the six witnesses who testified at the hearing before Panel No. 17 in the instant case, three did not appear at the second. Appellant did not agree to the second panel's consideration of their recorded testimony and the Grievance Administrator's belated attempts to argue their unavailability do not satisfy the requirements of our case law for the use of former testimony. See *Rotter v Detroit United Railway,* 217 Mich 686; 187 NW 271 (1922); *Karwick v Pickands,* 181 Mich 169; 147 NW 605 (1914).

Hearing Panel No. 2 found that Mr. Jaques violated disciplinary rules in four instances, which for the sake of convenient reference we characterize as findings I, II, III and IV, to wit:

I. That Mr. Jaques personally solicited the local laborer's union and some of its members to join in a class action Mr. Jaques was planning to file to compel the Coast Guard to investigate the tunnel explosion, in violation of DR 2-103(A) and DR 2-103(C). See also DR 2-104(A)(5).

II. That Mr. Jaques requested the agent for the local union, Robert J. McLaughlin, to recommend him to persons who had claims arising out of the explosion. DR 2-103(C) prohibits a lawyer from requesting another to recommend his employment.

III. That Mr. Jaques visited the home of Mrs. Rose Woolstenhulme, whose husband and grandson died in the explosion, and requested to be employed to represent her in violation of DR 2-103(A).

IV. That Mr. Jaques requested William Rounso-

ville, steward of the local laborer's union, to recommend him to survivors of victims of the tunnel explosion, violating DR 2-103(C).

Findings III and IV were based in substantial part upon the testimony of the witnesses Rose Woolstenhulme, Madalene Williams and William Rounsoville who appeared before Panel No. 17 but not before Panel No. 2. The State Bar Grievance Board affirmed. For the reasons stated, we reverse those two findings.

The erroneous use by Panel No. 2 of the transcript of the earlier testimony does not, however, vitiate the entire proceeding. See *Withrow v Larkin,* 421 US 35; 95 S Ct 1456; 43 L Ed 2d 712 (1975). We reject Mr. Jaques' contention that it does. It was not simply the hearing panel's reading of the transcript which causes us to reverse findings III and IV, but its use as substantive evidence to support those findings. In making findings of misconduct I and II, the hearing panel did not rely upon the challenged transcript, but upon other witnesses the panel did see and hear. The unfairness which resulted from the panel's improper reliance upon the transcript relates to findings III and IV only, and is amply rectified by our reversal of the Grievance Board's findings with respect thereto. In so concluding, we believe appellant's reliance upon *People v Ramsey,* 385 Mich 221; 187 NW2d 887 (1971) to be misplaced. *Ramsey* holds that in a criminal nonjury trial the presiding judge may not view the preliminary examination transcript. That decision is based on MCLA 768.26; MSA 28.1049 concerning the use of former testimony in criminal trials and the policy underlying a court rule[4] requiring, in the absence of consent,

---

[4] RCR 8.

that the judge who conducted the preliminary examination should not also try the case.

The requirements of a fair hearing are not technical. Mr. Jaques had a full evidentiary hearing before the hearing panel. The State Bar Grievance Board reviewed the entire record. Mr. Jaques is now before us on an appeal as of right. The members of this Court are bound to review the entire record to determine whether the findings, as affirmed by the Grievance Board, "have proper evidentiary support". *State Bar Grievance Administrator v Estes, supra,* 593; *State Bar Grievance Administrator v Beck,* 400 Mich 40; 252 NW2d 795 (1977); Grievance Rule 16.24(h). Recognizing Mr. Jaques' substantial stake in the outcome of this case, we believe the procedures afforded him satisfy the requirements of due process. We will, therefore, consider findings I and II and proceed to determine whether those findings have "proper evidentiary support", and whether the hearing afforded Mr. Jaques was otherwise fairly conducted.

## B.

Appellant next contends that Grievance Rule 16.5.2(b) which directs counsel for the State Bar Grievance Administrator to "[p]resent all available evidence relating to complaints" imposes upon him the same duty as that imposed upon the prosecutor in a criminal case to produce and examine all of the res gestae witnesses unless their testimony would be cumulative. *Hurd v People,* 25 Mich 405 (1872).

The duty to present all res gestae witnesses to a transaction or event has been applied only in criminal cases and, even then, is a duty imposed only upon the people. Its roots are in this Court's

historic concern that when the full investigative and prosecutorial power of the state is annoyed with an accused in a criminal case, the people's duty is not met where only such evidence as points toward guilt is produced when there exists other evidence which may suggest innocence. It is a product of judicial policy that the prosecutor may not pick and choose which witnesses will fairly present the whole picture, but requires the production of all witnesses to an alleged crime, leaving it to the trier of fact to decide whether in the totality guilt is proven. We have discovered no authority, and the appellant has invited our attention to none, suggesting the duty to call res gestae witnesses applicable to bar discipline proceedings. We decline to so extend the rule of criminal law.

We do agree, however, that although not bound by the prophylactic rule of criminal law concerning res gestae witnesses, counsel for the Grievance Administrator does have the duty to seek justice and to develop a full and fair record. See ABA Code of Professional Responsibility, Canon 7, Ethical Consideration 7-14 concerning government lawyers.[5]

The Grievance Administrator's duty was satisfied in the instant case. The two remaining charges against Mr. Jaques arose out of one incident. Counsel for the Grievance Administrator presented the testimony of two witnesses to that incident. Appellant called and examined several other persons present on the occasion. We believe the hearing was a fair one in this respect.

## C.

The hearing panel quashed a subpoena served

---

[5] Ethical Consideration 7-14 provides in pertinent part:

"A government lawyer in a civil action or administrative proceeding has the responsibility to seek justice and to develop a full and fair record * * * ."

by appellant on Eugene LaBelle, counsel for the State Bar Grievance Administrator at the proceedings before both hearing panels. Relying on *People v Davis,* 52 Mich 569; 18 NW 362 (1884), and *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975), appellant claims he was denied an opportunity to reach material matters. The subpoena here in question was served on Mr. LaBelle in March of 1975, after the hearing panel had heard seven days of testimony.

The reason given for calling Mr. LaBelle was to determine why some res gestae witnesses had not been called; whether any promise had been made to an attorney who was a chief witness against Mr. Jaques and who was associated with him during the period concerned here, that no complaint would be brought against the witness by the administrator in exchange for the testimony; and what conversations, if any, Mr. LaBelle had with other witnesses.

Appellant was afforded an opportunity to confront and cross-examine all of the witnesses against him. His claim, then, is that in the denial of an opportunity to question counsel, he was deprived of a fair hearing. The administrator, an assistant administrator and two investigators did testify before the hearing panel. Although we believe Mr. LaBelle could have testified, we do not believe the action of the hearing panel in quashing the subpoena deprived Mr. Jaques of a fair hearing. We will not extend *Reed, supra,* to disciplinary proceedings.

D.

Appellant next alleges he was denied a fair

hearing because the members of the hearing panel were not impartial and because they became "embroiled in the advocacy of the cause".

The allegation consists of several parts. We have already dealt with the effect of the hearing panel having viewed the transcript of the prior hearing. As to the alleged hostility of members of the hearing panel, we have reviewed the record and we are of the opinion that the *conduct* of the panel was entirely fair throughout the lengthy hearing and its members did not improperly examine witnesses. A trial judge may examine witnesses and call witnesses not called by either party. *Nicholson v Davis,* 327 Mich 115; 41 NW2d 494 (1950); *Masters v Massachusetts Bonding & Ins Co,* 349 Mich 98; 84 NW2d 462 (1957), and neither logic nor cited authority suggests the hearing panel may not do likewise. We must remember the nature of these proceedings and that we liberally construe the rules for the protection of the public, the courts and the profession. Grievance Rule 16.34. Appellant was not prevented from calling or cross-examining any witnesses or from getting important evidence into the record. We believe the record shows appellant's defense was not undermined. See *State Bar Grievance Administrator v Beck, supra.*

Appellant also complains of the hearing panel's ruling sustaining objections to questions put to it by his counsel concerning the appointment of members of the panel and possible previous connection with other discipline proceedings. We held in *State Bar Grievance Administrator v Baun,* 395 Mich 28; 232 NW2d 621 (1975), that the administrative connection between the Grievance Administrator, the hearing panel and the Grievance Board is sufficiently attenuated so that, without more, the discipline procedures are not inherently

defective. Absent specific allegations of facts indicating bias or improper composition of the hearing panel, we perceive no denial of due process. See *Baun, supra.*

Finally in this connection, appellant complains of alleged *ex parte* communications between members of the hearing panel and the grievance administrator. None of the citations to the record show any communications resulting in denial of a fair hearing. We do not believe a miscarriage of justice resulted from advice by counsel for the grievance administrator to members of the hearing panel that the administrator would oppose motions filed by appellant and his brief discussion concerning scheduling of hearing dates with one member, or from a member somehow hearing that appellant had served a subpoena on a potential witness. The members of the hearing panel stated that they had not discussed the merits of the case with counsel. Grievance Rule 16.34(c). See *Beck, supra.*

E.

Appellant's last due process argument concerns the addition of the second complaint and a claimed variance between the charges of the formal complaint and the findings of the hearing panel. We believe, first, that the complaints fairly informed appellant of the charges and that the findings we review here do not vary from the charges in those complaints. The charges are recited in footnote 3. A more definite statement could have been requested if one was desired and a conference could have been ordered on request to narrow the issues. GCR 1963, 115; Grievance Rule 16.11.

Moreover, we do not believe there was a failure to give advance notice of the charges which would

deprive appellant of due process. *In re Ruffalo,* 390 US 544, 550; 88 S Ct 1222; 20 L Ed 2d 117 (1968). Although the second complaint added more explicit detail regarding the charge of solicitation of and through McLaughlin concerning the class action, we believe the factual allegations of the original complaint were sufficient notice of that charge, particularly when the entire complaint is considered. It specified violation of DR 2-104(A)(5) which directly concerns class actions. See footnote 1. Indeed the first hearing opened with argument by counsel for Mr. Jaques that DR 2-104(A)(5) condoned his conduct. The State Bar argued that Mr. Jaques' interpretation of the rule was incorrect. This is not a case of charges being amended in the middle of a hearing to trap an attorney by his own testimony. Compare *Ruffalo, supra.* For the same reason we believe the addition of DR 2-103(A) by the second complaint was not unfair.

Similarly we are not persuaded that continuation of the hearing on the original charges after the Grievance Board allowed Mr. Jaques to withdraw his nolo contendere plea to the stipulated complaint amendments which involved solicitation of one survivor, Mrs. Woolstenhulme, and of Robert McLaughlin concerning a class action was unfair. We will not, as appellant requests, extend the principle of *People v McMiller,* 389 Mich 425; 208 NW2d 451 (1973), to discipline proceedings.

The principal policy reasons underlying the decision in *McMiller* to prohibit the imposition of charges of a greater offense following successful appeal of a plea-based criminal conviction were two, and were stated as follows:

"Allowing trial on a higher charge following reversal of a plea-based conviction of a lesser offense would (1) discourage exercise of the defendant's right to appeal a

conviction claimed to be based on an improperly accepted plea, and (2) tend to insulate from appellate scrutiny non-compliance with the guilty plea procedure established by the statute and the court rule." 389 Mich 432.

Overriding those considerations was the statistical reality that 75% of this state's criminal cases are disposed of by guilty plea and the *McMiller* Court's apparent desire to encourage a continuing high rate of plea-based dispositions in order to avoid the injustice inherent in criminal case docket backlog.

Those considerations are not applicable to bar discipline proceedings in this state.

## II

Mr. Jaques contends that it is not improper for a lawyer to contact others for the purpose of obtaining their joinder to an action in the nature of a class action.

Mr. Jaques had been retained on December 13, 1971 by the father of a deceased tunnel worker. At the hearing Mr. Jaques testified that he telephoned Robert J. McLaughlin, the union's business agent, for the purpose of discussing the possibility of the union and others joining in a class action he was going to bring to compel the Coast Guard to investigate the tunnel explosion. On December 15 a meeting was suggested and eventually agreed on and Mr. Jaques arranged for a room at a Holiday Inn near Port Huron. The meeting was held later that same day. McLaughlin, a number of union members invited by him (none of whom were victims or survivors of victims), and Father Luigi Maggioni, who represented the families of two victims, attended. Mr. Jaques took along some

newspaper clippings about a successful suit he had initiated similar to the class action he was proposing to file and some "agreements to represent" by which potential plaintiffs could join the suit. The agreements provided no fee would be charged. Several other persons who attended the meeting gave testimony which corroborated the foregoing.

Appellant argues that DR 2-104(A)(5) recognizes a privilege to "contact others for the purpose of obtaining their joinder" and that consequently he should not be disciplined for this activity. The State Bar argues that the disciplinary rule allows only the acceptance of employment, not solicitation of it.

DR 2-104(A) establishes a general prohibition on the acceptance of employment by lawyers who have given unsolicited legal advice. It then provides, however, five exceptions. The fifth, which is in issue here, provides:

"If success in asserting rights or defenses of his client in litigation in the nature of a class action is dependent upon the joinder of others, a lawyer may accept, *but shall not seek,* employment from those contacted for the purpose of obtaining their joinder." (Emphasis supplied.)

Without judging Mr. Jaques' determination that an action in the nature of mandamus to compel the Coast Guard to investigate the explosion was appropriate, or that the suit would be more likely to be successful if brought as a class action, we believe the disciplinary rules adopted by this Court are not tolerant of the sort of conduct in which Mr. Jaques was here engaged. Although Mr. Jaques had a client, no suit had yet been filed.[6] An

---

[6] There was no absolute need to enlist others to join the proposed class action as parties plaintiff. FR Civ P 23 allows one person to bring suit on behalf of a class.

in-person meeting was *initiated by Mr. Jaques* four days after the tragic tunnel explosion and involved persons with whom he had no prior professional contact. We are not here concerned with court-approved notice to members of a court-approved class.

The entire thrust of the disciplinary rules is that it is unprofessional for an attorney to seek out and solicit persons with whom he or she has no pre-existing relationship in order to suggest litigation begin. DR 2-103(A) prohibits a lawyer from recom-mending his employment to a nonlawyer who has not sought his advice regarding employment of a lawyer, and under DR 2-103(C) he may not request another to recommend his employment. We be-lieve DR 2-104(A)(5), although allowing acceptance of employment under certain circumstances, repre-sents continued disapproval of personal solicitation by lawyers of specific claims. See ABA Committee on Professional Ethics and Grievances, Formal Opinion No. 111 (May 10, 1934); ABA Committee on Ethics and Professional Responsibility, Infor-mal Opinion No. 1283 (November 20, 1973); *Hal-verson v Convenient Food Mart, Inc,* 458 F2d 927 (CA 7, 1972). Although we acknowledge and will consider that Mr. Jaques suggests a plausible in-terpretation of the rule, we do not believe it is a correct one.

## III

Mr. Jaques attacks the findings of the hearing panel as being unsupported by the evidence. We have reviewed the record to determine whether there is proper evidentiary support for the two remaining findings of misconduct, I and II.

The hearing panel first found, as discussed above, that Mr. Jaques had personally solicited the

local union and others to join in a class action that would be commenced. Mr. Jaques' own testimony is sufficient proof of this charge.

It was also found that Mr. Jaques requested the union agent, Mr. McLaughlin, to recommend him to persons who had claims arising out of the tunnel explosion. It is undisputed that Mr. Jaques telephoned Mr. McLaughlin, ostensibly for the purpose of getting the union to join the contemplated class action. McLaughlin's testimony at the second hearing supports the findings. He testified that he told Mr. Jaques that most of the families of the tunnel victims had not retained an attorney. Mr. Jaques suggested the two should meet. It is also fairly clear that Mr. Jaques gave Mr. McLaughlin a number of business cards and contingent fee contracts. Mr. Jaques' associate testified before Panel No. 2 that there was a one- to two-inch high stack of Jaques' business cards on a table at the motel, as well as a number of the standard contracts which Mr. Jaques' personal injury claim clients generally signed. Other witnesses who attended the meeting testified they did not see any cards or contracts on any table. Mr. Jaques claims the contracts given to McLaughlin concerned only the class action. However, McLaughlin testified on cross-examination that the contracts contained the word "death" which does not appear in the "authority to represent agreement" Mr. Jaques produced at that later hearing and claimed was the only agreement distributed at the Holiday Inn. McLaughlin testified that Mr. Jaques told him in regard to the business cards that he could "meet with my people" and pass them out, "my people" being the surviving family members of the deceased laborers. McLaughlin apparently did not actively distribute the agreements.

IV

In view of the foregoing we conclude that the findings that Mr. Jaques violated DR 2-103(A) and DR 2-103(C) by personally soliciting McLaughlin and members of the local laborer's union to join in a class action he was planning to file, and DR 2-103(C) by requesting McLaughlin, the agent for the local union, to recommend him to persons who had claims arising out of the tunnel explosion, heretofore described as Grievance Board findings I and II respectively, are supported by substantial evidence in the record.

As indicated, we reverse Grievance Board findings III and IV, the alleged solicitation of Rose Woolstenhulme and the alleged request of William Rounsoville to recommend Jaques to survivors of explosion victims.

Conduct violating rules of ethics adopted by this Court and conduct exposing the profession to obloquy, contempt, censure or reproach are grounds for discipline. State Bar Rule 15, §§ 2(2), 2(3) and 2(4).[7] The kind of solicitation involved in this case remains the classic example of the public concep-

---

[7] We are not unmindful that certain broad restrictions on lawyer advertising may no longer be imposed. In *Bates v State Bar of Arizona,* 433 US 350; 97 S Ct 2691; 53 L Ed 2d 810 (1977), the United States Supreme Court held that a rule which would punish truthful newspaper advertisement concerning the availability and terms of routine legal services is violative of the first Amendment. The Court specifically pointed out, however, that the problems of in-person solicitation and the attendant possibilities for the exertion of undue influence were not before it.

The instant case presents a situation not of impersonal advertising of routine services directed to the public in general. Rather, we are concerned with direct solicitation of specific claims by an attorney. In addition, it is clear from Mr. Jaques' own testimony that he took to Port Huron newspaper clippings relating his accomplishments as a lawyer. The decision in *Bates, supra,* also reserved decision on whether restrictions could be placed on claims as to the quality of services.

Since *Bates* does not reach the constitutionality of the disciplinary rules violated by Mr. Jaques, it is inapplicable to this case.

tion of "ambulance chasing" which not only exposes the profession to public contempt, but unjustly exposes its thousands of innocent individual members to concomitant derision and contempt despite their steady allegiance to ethical norms and professional self-discipline.

Having determined that the appellant is guilty of the misconduct described, we modify the Grievance Board's order of discipline to reduce the suspension of Mr. Jaques' license to practice law from 3 years to 24 months from and after the date of entry of our order to that effect and affirm the order as modified.

WILLIAMS, COLEMAN, and FITZGERALD, JJ., concurred with RYAN, J.

BLAIR MOODY, JR., J. *(concurring in part).* I concur with the analysis and conclusion that the appellant improperly contacted and sought employment from members of a union to join in a class action and asked a union official to solicit clients for him. However, I deem the discipline imposed under the circumstances to be excessive. All evidence relating to direct solicitation of families is excluded from our consideration. I would suspend for one year.

LEVIN, J. The grievance board found that Leonard C. Jaques solicited persons to join his clients, the parents of a victim of the Port Huron tunnel explosion, in a class action seeking a Coast Guard investigation of the explosion and asked a union business agent to recommend him to other persons who had claims arising out of the explosion.

The Court affirms the board's determination of professional misconduct on the grounds that Jaques acknowledged in his testimony at the griev-

ance hearing that he had solicited the union to join his clients in a class action and there was substantial evidence supporting the charge that he asked the union official to recommend him to persons who had claims.

A disciplinary rule permits a lawyer to communicate with others for the purpose of obtaining their joinder in "litigation in the nature of a class action" where "success in asserting rights or defenses of his client * * * is dependent upon the joinder of others". Code of Professional Responsibility and Canons, DR 2-104(A). The Court states that because no action had as yet been filed in behalf of Jaques' clients the communications seeking joinder were improper. This limitation is not found in the rule and conflicts with its policy.

There was indeed substantial evidence that supports the finding that Jaques asked a union official to recommend him to persons who had claims. The hearing panel, in findings adopted by the grievance board, said that "crucial" to this determination was the testimony of a young former associate of Jaques.[1] There was some other evidence, but there would not have been substantial evidence without her testimony.

A theory of the defense was that she had facilitated the solicitation of victims' families in a manner which gave the impression that Jaques had done so, and that she testified against him in the expectation that the grievance administrator would refrain from bringing charges against her.

The associate acknowledged that she asked Eu-

---

[1] Because of the nature of the allegations of Jaques and his witnesses regarding his former associate's activities, she is not identified by name in keeping with the policy of the State Bar Grievance Board Procedural and Administrative Rules that disciplinary files and records shall be kept confidential until a formal complaint is filed. *See* Grievance Rule 16.29.

gene LaBelle, attorney for the grievance adminis-
trator, shortly before she testified, whether she
would be charged and said he responded that he
did not believe it was likely. Jaques' lawyer was
not permitted to question LaBelle regarding his
conversations with this witness.

In finding against Jaques, the panel declared
"that there has been no demonstration of any
motive on the part" of the associate to testify
falsely. Its refusal to allow LaBelle to be ques-
tioned may have prevented Jaques from establish-
ing such a motive by showing that, as a result of
conversations between this witness and LaBelle
there was a basis for a reasonable expectation on
her part that if her testimony supported the alle-
gations against Jaques she would not face charges.

We would reverse and remand for further pro-
ceedings because Jaques had a right to seek to
impeach this witness by attempting to show that
her discussions with LaBelle provided a basis for a
reasonable expectation of forebearance or leniency.

I

Two days after the December 11th tunnel explo-
sion, the Woods retained Jaques to recover dam-
ages for the death of their son; they entered into a
contingent fee agreement. There is no claim that
Jaques obtained these clients or, indeed, any other
client, in violation of the canons or disciplinary
rules. The claim is that he solicited, apparently
unsuccessfully, for additional clients who had
claims arising out of the tunnel explosion.

The hearing panel found that on "December 14
* * * Jaques decided that the United States Coast
Guard should be required to investigate the tunnel

explosion as he was of the opinion they were more competent than the state agencies". In another case he had obtained Federal court order compelling the Coast Guard to make an investigation of an accident that occurred on Lake Erie.

Jaques telephoned the business agent for the local union of which 19 of those who died in the explosion were members, to arrange a meeting to discuss a class action to compel the Coast Guard to conduct an investigation of the explosion. Jaques was accompanied to the meeting by his associate. The business agent invited six union members and a priest to the meeting. None of those present was a victim or related to a victim. The priest was interested in the families of two who died in the explosion.

Jaques made a presentation urging the union and others to join his client in an action to compel a Coast Guard investigation.

The business agent testified that the discussion at the meeting concerned Jaques' efforts to obtain joinder in an effort to obtain a Coast Guard investigation. He said that because he was concerned with finding lawyers to represent "[his] people" he believes he asked Jaques for business cards. He recalled receiving agreement forms. By the time of the hearing he had discarded all the forms. He could not describe the contents of the form, but when shown Jaques' form contingent fee agreement he said it "looked like" the forms he received at the meeting. He denied that Jaques suggested that he "ought to get him some clients" or recommend him to victims' families.

Jaques testified that the forms he gave McLaughlin were "agreement to represent contracts", applicable only to the proposed class action, and

that they specifically provided that no fee would be charged.[2]

The associate confirmed that the purpose of the meeting was to discuss the proposed class action and that during the presentation Jaques told the audience there would be no charge for participation. She testified further, however, that Jaques piled a "fist full" of contingent fee agreement forms and a stack of business cards on a table in the meeting room.

The associate also testified that Jaques had given $100 to a union steward to cover expenses on a trip to Indiana to talk to widows of victims,[3] but the findings of the grievance board concerning solicitation through this person are set aside for the reasons set forth in my colleague's opinion.

Two of the union members who were present at the meeting and the priest said they did not recall seeing either stacks of business cards or of forms.

The Court infers from the business agent's affirmative response to the isolated question whether the form contained the word "death"[4] that the business agent thereby identified the forms he received as contingent fee forms. The thrust of the business agent's testimony, however, was that Jaques never asked him to solicit clients, and that Jaques' only concern was the class action.

It is apparent that the only substantial evidence supportive of the finding that Jaques "requested

[2] Jaques could not produce a copy of the agreement. He reconstructed a facsimile. The panel rejected Jaques' testimony that this was an accurate facsimile and, on the basis of the associate's testimony, found that the agreement was a contingent fee agreement.

[3] This testimony was contradicted by Mr. and Mrs. Woods. See fn 9, infra.

[4] Although the facsimile prepared by Jaques, assertedly from memory, did not contain the word "death", it is not at all improbable that an "agreement to represent" in connection with a class action to compel an investigation into an explosion which caused 21 fatalities would contain the word "death".

*the [business] agent for the local union * * * to* recommend him to persons who had claims arising out of the explosion" was the testimony of his former associate. (Emphasis supplied.)

There was no evidence that the business agent passed out any of the forms or that he himself solicited or caused anyone to solicit any of the victims' families. The only proper conclusion on this record is that none of the victims' families were solicited as a result of any effort by the business agent.[5]

After the associate completed her testimony, LaBelle and Jaques' lawyer entered into a number of stipulations, one of which was that the associate's testimony recounting conversations with LaBelle was incomplete. The panel refused to accept this stipulation and ordered that she reappear. On her further appearance, in response to a question concerning the omitted portion of the conversation, she said:

"In any event, indirectly related to this case was that I asked Mr. LaBelle if he though—and this was after I told him my version of the story—if he thought that anything I did would likely give rise to a complaint against me by the bar, and his answer was that, well, one never knows for sure about those things, but, having heard the facts, he did not believe that it was likely, that there would be any—."

Jaques subpoenaed LaBelle who refused to be sworn.[6] The hearing panel granted a motion to quash the subpoena.

[5] All the evidence regarding solicitation of victims' families is excluded from our consideration for the reasons set forth in my colleague's opinion.

[6] The following colloquoy indicates the clarity of the argument by Jaques' lawyer and the refusal of LaBelle to take the stand:

*"Mr. Corace [Attorney for Respondent]:* Call Gene LaBelle.

*"Mr. LaBelle:* I respectfully object, decline to be sworn as a witness

unless I'm given some tender as to the relevancy of my testimony. I have no actual knowledge as to whether or not Mr. Jaques solicited these cases, or acted in concert with the other people as alleged in the complaint. I have no knowledge with regard to any relevant or material collateral matters.

"*Mr. Corace:* An attorney is like any other person. He is bound to appear when subpoenaed. This attorney has been subpoenaed. He is bound to take the stand, and he is bound to testify, save only for confidential matters learned from his client. That's all.

"There are a host of cases that say that, and they apply to civil lawyers, and those cases are collected in Section 37.25—

"*Mr. Columbo [Vice Chairman of Hearing Panel]:* I think we all know the law, Mr. Corace. You realize there is a rule too that it is an unusual procedure to call a lawyer who is participating in a lawsuit.

"I suggest, Mr. Chairman, we have Mr. LaBelle take the stand and we will rule on the question.

"*Chairman Maiullo:* Take the stand, Mr. LaBelle.

"*Mr. LaBelle:* I respectfully refuse to do so, sir.

"You may cite me for contempt and the procedure is outlined in Rule 16.

\* \* \*

"*Mr. LaBelle:* If he thinks I have some relevant evidence, I would like to know what it is.

\* \* \*

"*Mr. Corace:* He knows one thing I'm going to ask him about. I'm going to ask him about his little visit to [the associate].

"*Mr. LaBelle:* I won't testify.

"*Mr. Corace:* I submit that is why he won't take the stand.

"*Mr. LaBelle:* That is not relevant in these proceedings, what I said to her. And besides that it is part of my work product.

\* \* \*

"*Mr. Corace:* We had a stipulation which he refused to receive. When he takes the stand, I'm going to ask him a few questions about like when he walked over here after [the associate] had said, golly, there was nothing I left out, after the second shot the panel gave her, and then he says, stands in front of her and reminds her about something, then she testifies, oh, yes, there was. Come on, now. Where is the privilege? The work product privilege is in discovery, civil discovery, but there is no work product privilege at trial.

"Now, you have known, Mr. Chairman, that this was a storm cloud looming on the horizon and so has Mr. LaBelle and the whole crux of my defense lies with him, right now. He took it upon himself to become investigator and go over to [the associate's] office and sit down with her and have a conversation, and then allowed me to examine her on what the conversation was, and then she was—then stipulated with regard to that conversation, and then came back—then she was called back, now, we have had a lot of it and that is one area that I'm certainly entitled to examine him on.

\* \* \*

## II

The panel found that in arranging the meeting and urging the union to join in a class action to compel a Coast Guard investigation Jaques had, on his own testimony, personally solicited employment in violation of the disciplinary rules.

A disciplinary rule provides that a lawyer may not seek employment from non-lawyers who have not sought his advice.[7] Jaques contends that he was not seeking employment but, rather, joinder in litigation in the nature of a class action as permitted by another disciplinary rule:

"If success in asserting rights or defenses of his client in litigation in the nature of a class action is dependent upon the joinder of others, a lawyer may accept, but shall not seek, employment from those contacted for the purpose of obtaining their joinder." Code of Professional Responsibility and Canons, DR 2-104(A)(5).

The administrator contends that "shall not

"*Mr. Columbo:* We brought [the associate] back to clarify that, and she told us, as I recall it, that she did talk to you about whether or not any charges would be brought against her.

"*Mr. LaBelle:* That is exactly true. Your recollection is perfect, Mr. Vice Chairman.

\* \* \*

"*Mr. Corace:* \* \* \* We have a right to show, through this witness, that after [the associate] was called here, and as the record shows, she was asked whether she had made any omission in her statement with regard to what was discussed between she and this witness, he walked over to her in this courtroom and reminded her of the testimony that she ultimately gave with regard to whether or not she was going to be charged with an unethical practice, and I submit to you that the precise and carefully worded statement that she used is, itself, grounds for examination of this witness. The words were, in substance, no, on the basis of the facts as you relate them to me \* \* \* ."

[7] "A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a nonlawyer who has not sought his advice regarding employment of a lawyer." Code of Professional Responsibility and Canons, DR 2-103(A).

seek" modifies both "employment" and "joinder" and that the rule therefore prohibits seeking either employment or joinder.

The Court notes that while the Woods had hired Jaques, no action "had yet been filed" when the meeting took place. It concludes that an attorney may not "seek out and solicit persons with whom he or she has no pre-existing relationship in order to suggest litigation begin" and that the "disciplinary rules * * * are not tolerant of the sort of conduct in which Mr. Jaques was here engaged".

The phrase in the disciplinary rule, "from those contacted for the purpose of obtaining their joinder", manifestly means that it is proper to communicate with others to obtain their joinder. The principal limitation is that a lawyer may not seek employment from persons with whom he communicates; the rule permits him to accept employment from such persons if offered.

Implicit in the rule is that a lawyer seeking joinder must have a client, but neither the language nor policy of the rule requires that an action have been commenced before solicitation of joinder in that action or in an ancillary action; "presuit communications" are permitted. *Halverson v Convenient Food Mart, Inc,* 458 F2d 927, 930–931 (CA 7, 1972). The only limitations in that regard are that the litigation be "in the nature of a class action" and that the client's success in asserting rights or defenses in such litigation is "dependent upon the joinder of others".

Delay in seeking joinder might be a disservice to the lawyer's client, playing into the hands of an adversary who might argue that the delay in seeking joinder should be counted against the client should the lawyer seek to add parties in an action already commenced or to commence an

ancillary class action. It might be of utmost impor-
tance to assemble all the forces at the outset to
persuade the judge of the substantiality of the
claim or the significance of the class.

All who testified, including the associate, agreed
that Jaques made it clear to the audience that
those joining in the class action would not be
charged; the hearing panel so found. The proposed
class action did not seek a money recovery but
simply an investigation.

There is no finding that the meeting was a
pretext and that the real purpose was to solicit the
families of victims to employ Jaques to represent
them on a contingent fee basis. On the contrary,
the panel found that Jaques' "purpose" in calling
the business agent was to solicit the union and
others to join in the class action.

Jaques subsequently filed an action in the
United States District Court in the name of the
Woods to compel a Coast Guard investigation.
(Neither the union nor any of the other victims
joined in this action. The action was not success-
ful.)

The rule differentiates between solicitation for
the purpose of obtaining joinder and solicitation of
employment. It is not unethical for a lawyer to
solicit other claimants to join with his client in a
class action "if his motive is not to secure fees for
himself". *Halverson v Convenient Food Mart, Inc,
supra,* p 931.[8]

---

[8] An ethics opinion states that while it is unethical for a lawyer to
solicit members of a class for funds to be used to pay compensation, it
is not unethical to solicit funds to defray expenses of preparation of a
class action. ABA Committee on Ethics and Professional Responsibil-
ity, Informal Opinion No. 1326 (May 27, 1975).

Another ethics opinion permits a lawyer to accept employment
from class members solicited by a client. The client, seeking joinder
and financial assistance in a class action, mailed potential class
members a request for an immediate contribution and a limited

Jaques had a client when he communicated with the business agent and sought the union's joinder in the class action. He may not properly be disciplined for expeditiously seeking joinder of others in the action to compel a Coast Guard investigation.

## III

In finding that Jaques gave the business agent contingent fee forms and requested that he solicit clients for him, the panel relied primarily on the testimony of Jaques' former associate. Her credibility was, therefore, as the panel itself observed, of "crucial" importance.

Jaques sought to impeach her. He said that she had lied to him on several occasions, and that they were not on good terms when she left his employ. Witnesses contradicted various aspects of her testimony.[9]

power of attorney authorizing the client to retain the lawyer and assign him a contingent fee of 35% and a contingent interest of 12% to the client. The lawyer drafted the documents. ABA Committee on Ethics and Professional Responsibility, Informal Opinion No. 1280 (August 8, 1973).

[9] The associate testified that she accompanied Jaques to the Woods' home and that the union steward arrived a short time later. She said she was present at all times during the meeting and that Jaques gave the steward contingent fee forms, business cards and $100 to cover expenses of the Indiana trip.

Jaques said that he visited the Woods' home in response to a telephone call from Woods about other lawyers trying to persuade him to change lawyers and that the union steward, a friend of Woods' son, arrived soon thereafter. He said that the associate was not present at all times; part of the time she was in another room talking to Mrs. Woods. Jaques said that he gave the steward $22 which the steward told Woods his son owed him when he died and which Woods did not have at the time. He said that he paid the money to avoid embarrassment to Woods and that Woods paid him back.

Jaques denied giving the steward contingent fee forms. He said that the steward asked him if he could recommend him to people who were looking for lawyers in connection with the explosion and that he told the steward he would be glad to talk to such persons, but that the steward should not "push" for him. Jaques also said that the

It was Jaques' position that it was she who was guilty of misconduct. A witness testified that she gave him Jaques' contingent fee forms and business cards. Jaques said this was without his knowledge. The priest said that the associate called him within two days after the meeting to question him regarding the two families in which he had an interest. Jaques testified that the associate would receive a percentage of the legal business she brought to his firm.

Jaques sought to prove that the associate was fearful that she would be charged with misconduct and agreed to testify against him in an effort to avoid being charged herself. The panel erred in denying Jaques' lawyer the opportunity to question LaBelle regarding any discussion or understanding with the associate.[10] See *People v Davis,* 52 Mich 569; 18 NW 362 (1884); *People v Reed,* 393 Mich 342, 354; 224 NW2d 867 (1975).

Evidence of a witness's interest or motive for testifying has a direct bearing on credibility.[11] The issue is never collateral.[12]

---

steward asked to see a contingent fee agreement and that Woods showed the steward his agreement.

Jaques' story concerning the money and the agreement was corroborated in its essentials by Mr. and Mrs. Woods.

[10] The associate was not LaBelle's client; there was no attorney-client privilege.

While a lawyer ordinarily should not act if he knows he will be called to testify, this does not disable or shield him from testifying. Code of Professional Responsibility and Canons, DR 5-101(B); DR 5-102. Whether a lawyer who unexpectedly is called should continue to represent his client depends on all the circumstances. *See* Code of Professional Responsibility and Canons, DR 5-101(B)(4); *cf. Phillips v Liberty Mutual Insurance Co,* 43 Del Ch 436; 235 A2d 835 (1967); *Galarowicz v Ward,* 119 Utah 611; 230 P2d 576 (1951).

[11] MCLA 600.2158; MSA 27A.2158; *People v Jackson,* 390 Mich 621, 625, fn 2; 212 NW2d 918 (1973); *People v Sesson,* 45 Mich App 288, 301; 206 NW2d 495 (1973), *lv den* 389 Mich 801 (1973). *See, generally,* 3A Wigmore, Evidence (Chadbourn rev), §§ 948–949, pp 783–792; McCormick, Evidence (2d ed), § 40, pp 78–80.

[12] McCormick, *supra;* Wigmore, *supra; Geary v People,* 22 Mich 220, 222 (1871).

The panel relied fundamentally on the associate's testimony in finding that Jaques had requested the business agent to solicit clients for him. The panel chose to believe her in preference to the conflicting testimony of Jaques, the business agent and other witnesses because "there has been no demonstration of any motive on [her] part * * * [w]hile, on the other hand, Jaques' motive to fail to be completely truthful and honest with the panel can be explained only by either his failure to have the integrity to tell the truth and/or his desire not to be punished for the offense which appears to this panel to be clear".

The associate acknowledged that she was apprehensive she might be charged. If the panel had believed Jaques it is possible she would have been charged.

"[A]greements regarding the testimony of a witness materially affect the bias or interest of a witness and should be placed before the trier of fact."[13] Even if there has been no actual promise of leniency, it is proper "to show a belief or even only a hope" of securing favorable treatment, in return for testimony. *Farkas v United States,* 2 F2d 644, 647 (CA 6, 1924).[14]

Jaques was not bound by the associate's statement denying that LaBelle had made any commitment. She "was certainly not as reliable or objective a source of testimony" regarding her motives for testifying as LaBelle who was likely to know under what, if any, pressures she may have been; LaBelle's testimony "may well have differed in

---

[13] *People v Glover,* 47 Mich App 454, 459; 209 NW2d 533 (1973). *Similarly, see People v McCoy,* 392 Mich 231; 220 NW2d 456 (1974).

[14] Although these cases and others cited in this opinion arise out of criminal prosecutions, the principle is the same in civil litigation. *See Foster v Krause,* 187 Mich 630; 153 NW 1066 (1915); *Durant v Stahlin,* 374 Mich 82, 90, fn 5; 130 NW2d 910 (1964); McCormick, *supra,* § 40, pp 78–80 and § 274, p 665, fn 94.

substantial degree from the testimony given by" the associate.[15]

The associate was in a most difficult position. She was concerned that she might face grievance board action. The administrator's case depended on her testimony.

The associate's initial testimony regarding her discussions with LaBelle was incomplete as La-Belle and she subsequently acknowledged. LaBelle, who was not personally involved, could be expected to be more objective than the associate and fully straightforward in his testimony. His testimony would have cleared the air and resolved any doubt regarding expectations of leniency engendered by explicit or tacit understandings with the grievance administrator or LaBelle.

The confidence of the profession and of the public in the administration of grievance proceedings is not served by the refusal of the administrator's counsel to be sworn and testify fully regarding any circumstances which might affect the legitimacy of the evidence on which the administrator relies in asserting that a lawyer has not conducted himself in accordance with the standards of the profession.

## IV

The discipline imposed by the grievance board, three years suspension, manifestly was based on the findings of solicitation of victims' families set aside by this Court.

The reduced discipline, two years suspension,

---

[15] *See Hughes v United States,* 427 F2d 66, 68 (CA 9, 1970), where the United States Court of Appeals for the Ninth Circuit held that although an informant admitted charges were pending against him and his hope for leniency, the defendant should have been permitted to question a police officer regarding any pressure exerted upon the informant during conversations between the officer and the informant.

cannot, in light of the discipline imposed by other hearing panels and the grievance board, be justified on the findings that are affirmed.

—In two cases lawyers were *reprimanded* for soliciting worker's compensation claims through runners.[16]

—In one case the lawyers offered a police officer compensation to refer arrested persons to them; paralleling the facts here, no referrals were made and there was no further communication between the lawyers and the officer. The lawyers were *reprimanded.*[17]

—A *two-month suspension* was imposed where the lawyer pled nolo contendere to two of five counts charging solicitation of clients in traffic court; the other counts were dismissed.[18]

—The grievance board increased the 120-day suspension imposed by the hearing panel to a *one-year suspension* "for solicitation of three personal injury claims where the evidence disclosed money was paid layman *[sic]* for referring clients to him".[19]

The novel construction of the disciplinary rule aside, neither the union nor any other person joined Jaques' client in the class action. There is no evidence that the business agent or anyone acting at his suggestion solicited anyone to employ Jaques; Jaques obtained no client and no fees from the asserted request for clients. It is not claimed that he promised the business agent any compensation; the business agent was not a police officer or other public official.

---

[16] State Bar Grievance Board, Synopses of Cases Disposed of by Formal Hearing from March 1, 1970 (looseleaf), Reprimands, p 6, File No. 27980; *id,* p 14, File No. 27981.

[17] *Id,* p 29, File Nos. 32798, 32800.

[18] *Id,* Suspensions, p 19, File No. 30413.

[19] *Id,* p 28, File No. 29651.

The discipline is excessive and appears to be imposed on the evidence supportive of the findings of actual solicitation by or for Jaques of families of victims that have been set aside.

We would reverse and remand for further proceedings.

KAVANAGH, C. J., concurred with LEVIN, J.