STATE BAR GRIEVANCE ADMINISTRATOR v JAQUES (ON REMAND)

Docket No. 58697. Argued March 2, 1977 (Calendar No. 8).—Decided October 24, 1977. Judgment vacated by the Supreme Court of the United States and remanded for further consideration June 12, 1978. Argued on remand March 6, 1979 (Calendar No. 1).— Decided July 30, 1979.

Leonard C. Jaques was suspended from the practice of law for three years by the State Bar Grievance Board for soliciting employment by victims and survivors of a tunnel explosion at Port Huron. On appeal, the order of discipline was modified to suspend the respondent's license to practice law for 24 months from the date of the Court's order. 401 Mich 516 (1977). The Supreme Court of the United States vacated the judgment and remanded the matter for further consideration in light of a recent decision concerning solicitation by an attorney of employment on a contingent fee agreement. 436 US 952 (1978).

In an opinion by Justice Ryan, joined by Justices Kavanagh, Levin, Fitzgerald, and Blair Moody, Jr., it was held that the controlling opinion of the Supreme Court of the United States forbids the Supreme Court of Michigan to construe the Code of Professional Responsibility and the rules governing the State Bar of Michigan as prohibiting the particular conduct for which the respondent has been disciplined.

1. In the original decision in this case, the Supreme Court of Michigan did not consider the then undeclared constitutional dimensions of the disciplinary rules prohibiting attorney solicitation, but confined the inquiry to whether the respondent's conduct violated the literal prohibitions of the disciplinary rules. The Supreme Court of the United States has now pro-

REFERENCES FOR POINTS IN HEADNOTES

[1-5, 9-16] 7 Am Jur 2d, Attorneys at Law §§ 40, 42, 43.

20 Am Jur 2d, Courts § 226.

Advertising by attorney as ground for disbarment, suspension, or other disciplinary action. 39 ALR2d 1055.

[2, 4-9, 11] 16 Am Jur 2d, Constitutional Law §§ 346, 347.

The Supreme Court and the right of free speech and press. 2 L Ed 2d 1706.

[6, 8] 16 Am Jur 2d, Constitutional Law § 302.

[15, 16] 7 Am Jur 2d, Attorneys at Law § 67.

vided some guidance on the constitutional dimensions of the disciplinary rules. The careful language with which that Court framed its holding manifestly suggests that attorney disciplinary rules may not prohibit solicitation by attorneys per se. In-person solicitation of remunerative employment is not removed from the protection of the First Amendment, although the level of judicial scrutiny is lower. The appropriate inquiry is whether the particular conduct of the attorney is likely to result in the adverse consequences which the state has a legitimate and important interest in prohibiting.

2. The particular conduct attributed to the respondent does not rise to the level of "fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct" which the disciplinary rules may seek to prevent under the decision by the Supreme Court of the United States. The respondent did not directly contact any prospective client; his solicitation was directed to a union business agent who ostensibly represented the interests of union members with potential claims. The business agent possessed the expertise to make a detached and informed evaluation of the respondent's qualifications before making any recommendation to union members. There is no claim that the union business agent was nothing more than a "runner" or agent for the respondent. In this case the union business agent served as a buffer between the respondent attorney and prospective clients, thus alleviating the potential for overreaching and undue influence. The other charges of in-person solicitation have been previously dismissed on procedural grounds. The order of the State Bar Grievance Board is vacated.

Chief Justice Coleman, joined by Justice Williams, dissented. She wrote:

1. The Supreme Court of the United States has reaffirmed that the states may authorize a bar association to discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the state has a right to prevent. However, if the exercise of these powers regulates conduct within the First Amendment's protective ambit, then such regulations must pass constitutional scrutiny.

2. The Supreme Court of the United States carefully identified the First Amendment interests in the light of which this case was to be considered on remand, and it characterized the activities at issue in the former case as a "commercial transaction". It did not discard the "commonsense" distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to governmental regulation, and

other varieties of speech, political, associational and expressional, which are at the core of the First Amendment protection. Where the solicitation did not involve any political expression or an exercise of associational freedom employing constitutionally privileged means of expression to secure constitutionally guaranteed civil rights, the stricter standard of judicial review warranted by those political and associational freedoms is not applicable. The decision did not remove such speech entirely from the protection of the First Amendment, but it lowered the level of appropriate judicial scrutiny.

3. In the area of commercial speech, the most commonly recognized First Amendment interest is preserving the free flow of information. State regulations affecting these First Amendment interests will be held unconstitutional if they do not sufficiently advance justifiable state interests. The state has a legitimate and compelling interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct, and the rules prohibiting solicitation are prophylactic measures whose objective is the prevention of harm before it occurs. The state's strong interest in preventing the evils likely to result from unregulated in-person solicitation, together with the fact that it would be difficult to prove that harm actually occurred, justify the prophylactic measures. Therefore, the disciplinary rules could constitutionally be applied to an attorney's conduct even without proof of actual harm.

4. The respondent in this case does not claim that his conduct involved any political expression or the exercise of an associational freedom in an effort to secure constitutionally protected rights, and the more stringent constitutional standards employed when those interests are present do not apply. The respondent claims that his conduct provided potential clients with information about their legal rights and remedies and the availability and terms of his legal services, and that the disciplinary rules unjustifiably curtail the free flow of this commercial information. Applying the rules in this case will not necessarily curtail the flow because the rules do not prohibit the respondent from communicating information to people about their legal rights and remedies or recommending that they obtain counsel; they do prohibit a lawyer from recommending employment of himself and requesting that others recommend him.

5. The state's interests in regulating solicitation by attorneys are particularly strong. In addition to the general interest in protecting consumers, the state bears a special responsibility

for maintaining standards among members of its licensed professions. Some of the substantive evils sought to be prevented by the regulations prohibiting solicitation include: stirring up litigation, assertion of fraudulent claims, debasing the legal profession, and potential harm to the prospective client due to overreaching, undue influence, and invasions of privacy. These legitimate interests of the state justify regulations prohibiting solicitation in circumstances where harm is likely to occur, and as a constitutional matter the absence of any proof or finding of harm in any particular case is immaterial.

6. When determining whether the state can constitutionally impose discipline in this case, the appropriate focus is on the respondent's conduct. The respondent argues that his conduct can be distinguished from that disapproved of within the narrow holding of the Supreme Court of the United States. Whether the Constitution permits or prohibits the regulation of solicitation in situations which fall between the extremes of the cases previously decided by the Supreme Court of the United States does not depend solely on whether the factual situation in the case in question is identical to the facts presented in the extreme cases. It depends on how the standards applied in those cases, and their underlying considerations, apply to the case in question.

7. The gravamen of the complaint against the respondent was that he requested that another person, the business agent of the labor union whose members were in the explosion, recommend employment of him to potential clients in violation of the Disciplinary Rules of the Code of Professional Responsibility. The use of another person as an intermediary to solicit potential clients may pose dangers as substantial as soliciting them directly. The relative magnitude of these potential dangers depends on the facts of each case, and can vary with the intermediary chosen and the actions taken by the intermediary. The use of some intermediaries, e.g., an approved lawyer reference service, may reduce the potential for overreaching which is present when an attorney solicits clients in person, but there is nothing inherent in the use of a personal intermediary which will necessarily remove the possibility of overreaching, undue influence, and invasion of privacy that the state has a right to prevent.

8. The potential for overreaching or undue influence is substantial when the intermediary solicits the client in person. The intermediary may also be a person trained in the art of persuasion, e.g., a salesperson. Such in-person solicitation may exert pressure and often demands an immediate response with-

out providing an opportunity for comparison or reflection. These factors distinguish this conduct from advertising by attorneys which simply provides access to information and leaves the recipient free to act on it or not.

9. The use of an intermediary who is not an attorney to solicit potential clients may also present other risks. The non-lawyer intermediary may be more likely to misstate the applicable law or the client's legal remedies, either through inadvertence or ignorance or on purpose, in attempting to persuade the client to employ a specific attorney, and may even attempt more extreme, less ethical conduct than an attorney might use in soliciting clients because he might not feel bound to adhere to the standards incorporated into the Code of Professional Responsibility. The use of intermediaries would also significantly increase the likelihood that the privacy of potential clients would be invaded. Finally, the potential for all these harms increases if the intermediary has or perceives that he might have an interest in successfully soliciting clients. Therefore, the use of intermediaries is just as likely to pose dangers that the state has a right to prevent as direct in-person solicitation by an attorney.

10. Unions can fulfill a valuable and important function in assisting their members to gain access to, and in compiling information on the availability of, legal assistance, but the application of these disciplinary rules to the respondent's conduct will not hinder or diminish the ability of the union to fulfill this function. The disciplinary rules apply to attorneys; they do not directly apply to the union or its members. The application of this rule to the respondent's conduct will not diminish the ability of the workers to associate together in furtherance of a legal purpose. Therefore, the respondent's claim that his conduct did not create circumstances likely to pose dangers that a state has a right to prevent is not acceptable. The fact that he initiated the meeting with the union agent and others did not destroy the state's right to prevent the harms which are likely to result from this type of conduct.

11. The presence of a pecuniary motive in attorney solicitation cases creates special conflict of interest problems, but the fact that some services are offered free of charge does not necessarily guarantee the absence of a pecuniary motive or eliminate the dangers of overreaching, undue influence or invasion of privacy. One may have a pecuniary motive, or perceive a pecuniary interest, even though no fee is being charged for the immediate service. Also, money is not the only consideration which motivates people. The desire for publicity

or exposure could also motivate an attorney to solicit clients for a case for which no fee would be charged. Accordingly, the absence of an immediate apparent pecuniary interest is not necessarily determinative of the issue.

12. It is difficult to prove an attorney's state of mind or motives during these transactions. Therefore, the efficacy of the state's efforts to reduce the possibility of the evils which can result from in-person solicitation by attorneys would be significantly reduced if the state, having proven solicitation in circumstances likely to present harm, must also prove that the solicitor has a pecuniary motive. The respondent has failed to show that his conduct did not create circumstances likely to pose dangers that the state has a right to prevent merely by showing that his present investigatory services were offered free of charge. If the respondent had no motive for accepting this employment other than desiring to help the victims and others, it is more likely that he would have recommended that they retain another attorney rather than recommend himself and request that others recommend him. Nor would it have been deemed necessary to demonstrate his success in obtaining high verdicts or to display his newspaper clippings.

13. Applying the Disciplinary Rules of the Code of Professional Responsibility to prohibit this type of commercial activity will not unjustifiably curtail the free flow of information. The rules do not prohibit the giving of unsolicited legal advice. They prohibit an attorney from recommending employment of himself and requesting that others recommend him. These prophylactic measures reflect substantial state interests in preventing solicitation in circumstances where harm is likely to occur. The respondent's activities created a potential for harm which justified, as a constitutional matter, the application of these regulations in furtherance of the state's interests even in the absence of proof or a finding of actual harm. The application of the disciplinary rules to the respondent's conduct did not offend the First and Fourteenth Amendments. The order suspending the respondent's privilege to practice law should be reinstated.

### OPINION OF THE COURT

1. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — CONSTITUTIONAL LAW.

   The careful language with which the Supreme Court of the United States framed its holding in a decision concerning solicitation by an attorney of employment on a contingent fee agreement suggests that State Bar disciplinary rules may not

prohibit solicitation by attorneys per se (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103, 2-104).

2. ATTORNEY AND CLIENT — FREE SPEECH — SOLICITATION.

In-person solicitation of remunerative employment by an attorney is not removed from the protection of the First Amendment, although the level of judicial scrutiny is lower; the appropriate inquiry is whether the particular conduct of the attorney is likely to result in the adverse consequences which the state has a legitimate and important interest in prohibiting (US Const, Am I, Am XIV).

3. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — CONSTITUTIONAL LAW.

Conduct of a lawyer did not rise to the level of "fraud, undue influence, intimidation, overreaching, and other forms of vexatious conduct" which the State Bar disciplinary rules may seek to prevent where the lawyer did not directly contact any prospective client, but his solicitation was directed to a union business agent who ostensibly represented the interests of union members with potential claims; the business agent possessed the expertise to make a detached and informed evaluation of the respondent's qualifications before making any recommendation to union members; there is no claim that the union business agent was nothing more than a "runner" or agent for the respondent; and the union business agent served as a buffer between the respondent attorney and prospective clients, thus alleviating the potential for overreaching and undue influence (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103).

DISSENTING OPINION BY COLEMAN, C.J.

4. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — CONSTITUTIONAL LAW.

*The state may constitutionally discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the state has a right to regulate (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103[A], DR 2-104[A]).*

5. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — CONSTITUTIONAL LAW — POLICE POWER.

*The states enjoy broad power to regulate the practice of professions within their boundaries and the interest of the states in*

regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts; however, if the exercise of these powers regulates conduct within the First Amendment's protective ambit, then such regulations must pass constitutional scrutiny (US Const, Am I, Am XIV).

6. CIVIL RIGHTS — FREE SPEECH — POLICE POWER.

The government may only with narrow specificity regulate political, associational, and expressional speech, which are at the core of the First Amendment's protective ambit (US Const, Am I, Am XIV).

7. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — CONSTITUTIONAL LAW.

The strict standard of judicial review warranted by political expression or an exercise of associational freedom to secure constitutionally guaranteed civil rights is not applicable to solicitation by a lawyer of employment which does not involve those civil rights; while this does not remove such speech by the lawyer entirely from the protection of the First Amendment, it lowers the level of appropriate judicial scrutiny (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103, DR 2-104).

8. CIVIL RIGHTS — FIRST AMENDMENT — COMMERCIAL SPEECH — POLICE POWER.

It is a matter of public interest that commercial decisions, in the aggregate, be intelligent and well informed, and to this end, the free flow of commercial information is indispensable; when state regulations affect the First Amendment interests in the area of commercial speech, the regulations will be held unconstitutional if they do not sufficiently advance justifiable state interests (US Const, Am I, Am XIV).

9. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — CONSTITUTIONAL LAW.

The State Bar disciplinary rules prohibiting solicitation are prophylactic measures whose objective is the prevention of harm before it occurs; the state's strong interest in preventing the evils likely to result from unregulated in-person solicitation constitutionally justifies application of the disciplinary rules to an attorney's conduct even without proof of actual harm (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103, DR 2-104).

10. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITA-
    TION — FREE SPEECH.

    *Application of State Bar disciplinary rules to solicitation by a
    lawyer does not necessarily curtail the free flow to potential
    clients of information about their legal rights and remedies and
    the availability and terms of the attorney's legal services; the
    disciplinary rules do not prohibit a lawyer from giving unsoli-
    cited legal advice, but proscribes the acceptance of employment
    resulting from such advice (Code of Professional Responsibility
    and Canons, DR 2-103, DR 2-104).*

11. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITA-
    TION — POLICE POWER.

    *The legitimate interests of the state in regulating solicitation by
    attorneys are particularly strong and justify regulations prohib-
    iting solicitation in circumstances where harm is likely to
    occur, and as a constitutional matter, the absence of any proof
    or finding of harm in any particular case is immaterial (US
    Const, Am I, Am XIV; Code of Professional Responsibility and
    Canons, DR 2-103, DR 2-104).*

12. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITA-
    TION — CONSTITUTIONAL LAW.

    *The appropriate focus, in determining whether the state can
    constitutionally impose discipline on a lawyer for soliciting
    employment, is on the lawyer's conduct; whether the Constitu-
    tion permits regulation of solicitation depends on how the
    standards applied in caselaw and the considerations underlying
    those standards apply to the case in question (US Const, Am I,
    Am XIV; Code of Professional Responsibility and Canons, DR 2-
    103, DR 2-104).*

13. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITA-
    TION — CONSTITUTIONAL LAW.

    *The use of intermediaries by an attorney to solicit employment is
    just as likely to pose dangers that the state has a right to
    prevent as direct in-person solicitation by an attorney; there-
    fore, the fact that an attorney requested that another person
    solicit potential clients, rather than soliciting them himself,
    does not necessarily make his discipline for the solicitation
    unconstitutional (US Const, Am I, Am XIV; Code of Profes-
    sional Responsibility and Canons, DR 2-103, DR 2-104).*

14. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITA-
    TION — LABOR UNIONS — CONSTITUTIONAL LAW.

    *The constitutional rights of labor union members concerning the*

*assertion of their legal rights are not hindered or diminished by the application of State Bar disciplinary rules to an attorney who requested that the agent for a local union recommend him to persons who had claims arising out of a tunnel explosion which involved local union members; therefore, the state's right to discipline an attorney to prevent the harms which are likely to result from solicitation is not diminished by the claim that his conduct in informing the business agent of his availability allowed the union to make an "informed" recommendation to its members of their legal rights (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103, DR 2-104).*

15. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — PECUNIARY MOTIVE — CONSTITUTIONAL LAW.

*The fact that some legal services are offered free of charge does not necessarily guarantee the absence of a pecuniary motive in solicitation of employment or eliminate the dangers of overreaching, undue influence or invasion of privacy; even where no immediate pecuniary interest is apparent, the possibility of future interests, or a combination of other considerations, may supply an equivalent motive (US Const, Am I, Am XIV; Code of Professional Responsibility and Canons, DR 2-103, DR 2-104).*

16. ATTORNEY AND CLIENT — DISCIPLINARY PROCEEDINGS — SOLICITATION — MOTIVE.

*An attorney charged with professional misconduct in soliciting employment failed to show that his conduct did not create circumstances likely to pose dangers that the state has a right to prevent merely by showing that his investigatory services concerning a tunnel explosion were offered free of charge; if the attorney had no motive other than desiring to help the victims and others, it is more likely that he would have recommended that they retain another attorney rather than recommend himself and request that others recommend him, nor would it have been necessary to demonstrate his success in obtaining high verdicts or to display his newspaper clippings (Code of Professional Responsibility and Canons, DR 2-103, DR 2-104).*

*Louis Rosenzweig,* Attorney for State Bar Grievance Administrator, and *Eugene N. LaBelle,* Associate Counsel.

*Gromek, Bendure & Thomas* for respondent.

RYAN, J. *(to vacate order of the Grievance Board).* I must respectfully disagree with the opinion of the Chief Justice.

Following publication of my original opinion in this case, affirming in part the decision of the State Bar Grievance Board and suspending respondent from the practice of law for two years, the United States Supreme Court decided *Ohralik v Ohio State Bar Ass'n,* 436 US 447; 98 S Ct 1912; 56 L Ed 2d 444 (1978). Thereafter that Court directed us to reconsider our original decision in light of *Ohralik, supra.*

Having done so, I am persuaded that *Ohralik* forbids us to construe this state's Code of Professional Responsibility and the Supreme Court Rules governing the State Bar of Michigan as prohibiting the particular conduct for which we disciplined respondent.

In our original decision, we did not consider the then undeclared constitutional dimensions of the disciplinary rules prohibiting attorney solicitation. We confined our inquiry to whether respondent's conduct violated the literal prohibitions of DR 2-103(A) and DR 2-103(C). The Supreme Court had yet to provide guidance in the area of attorney solicitation beyond its decision in *Bates v State Bar of Arizona,* 433 US 350; 97 S Ct 2691; 53 L Ed 2d 810 (1977), dealing with broad restrictions on the impersonal media advertising of routine legal services.[1] The Court has now provided such guidance in *Ohralik.*

The careful language with which the Supreme Court framed its holding manifestly suggests that disciplinary rules may not prohibit attorney solici-

---

[1] See footnote 7 in this Court's original opinion, *State Bar Grievance Administrator v Jaques,* 401 Mich 516, 543; 258 NW2d 443 (1977).

tation per se.[2] We would be remiss in our obligation to adhere to the spirit of that decision if we choose to limit its impact on our own disciplinary rules which prohibit all forms of attorney solicitation. Under *Ohralik,* in-person solicitation of remunerative employment by an attorney is not removed from the protection of the First Amendment although the level of judicial scrutiny is lower. The appropriate inquiry is whether the particular conduct of the attorney is likely to result in the adverse consequences which the state has a legitimate and important interest in prohibiting.[3] *Ohralik, supra,* 462-464.

I am unconvinced that the particular conduct attributed to Jaques in findings I and II rises to the level of "fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct' " which the disciplinary rules may properly seek to prevent. *Ohralik, supra,* 462. Jaques did not directly contact any prospective client. His

[2] "The Court expressly reserved the question of the permissible scope of regulation of 'in-person solicitation of clients—at the hospital room or the accident site, or in any other situation that breeds undue influence—by attorneys or their agents or "runners." ' *[Bates v State Bar of Arizona,* 433 US 350, 366; 97 S Ct 2691; 53 L Ed 2d 810 (1977)]. Today we answer part of the question so reserved, and hold that the State—or the Bar acting with state authorization—constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent." 436 US at 449.

[3] "The American Bar Association, as *amicus curiae,* defends the rule against solicitation primarily on three broad grounds: It is said that the prohibitions embodied in DR 2-103(A) and 2-104(A) serve to reduce the likelihood of overreaching and the exertion of undue influence on lay persons, to protect the privacy of individuals, and to avoid situations where the lawyer's exercise of judgment on behalf of the client will be clouded by his own pecuniary self-interest.

"We need not discuss or evaluate each of these interests in detail as appellant has conceded that the State has a legitimate and indeed 'compelling' interest in preventing those aspects of solicitation that involve fraud, undue influence, intimidation, overreaching, and other forms of 'vexatious conduct.' Brief for Appellant 25. We agree that protection of the public from these aspects of solicitation is a legitimate and important state interest." 436 US at 461-462.

solicitation was directed to a union business agent who ostensibly represented the interests of union members with potential claims. The union agent possessed the expertise to make a detached and informed evaluation of Jaques' qualifications before passing any recommendation along to his members.[4] There is no claim that the union official was in fact nothing more than a "runner" or agent for Jaques. Under these circumstances, the union agent served as a buffer between the attorney and prospective clients thus alleviating the potential for overreaching and undue influence.

We have no occasion today to address the propriety of disciplining an attorney for the type of in-person solicitation attributed to Jaques in findings III and IV of the State Bar Grievance Board. Those findings were dismissed on the prior appeal because of procedural irregularities.

While as a lawyer I am now no less offended by the unprofessional behavior of Mr. Jaques in connection with the Port Huron tunnel explosion cases than when I wrote to discipline him for it, in obedience to the authority of the Supreme Court which has given it constitutional countenance, I vote to vacate the order of the Grievance Board.

KAVANAGH, LEVIN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

COLEMAN, C.J. In *State Bar Grievance Administrator v Jaques,* 401 Mich 516; 258 NW2d 443 (1977), this Court affirmed, as modified, a State Bar Grievance Board order suspending respondent's privilege to practice law. The suspension was based on findings that respondent violated DR 2-

---

[4] The union agent in the instant case demonstrated the independent nature of his judgment in such matters by deciding not to recommend Jaques' services or to forward any of his materials to union members with potential claims.

103(A)[1] and DR 2-103(C)[2] by personally soliciting others to join in a class action he was planning to file and DR 2-103(C) by requesting the agent for a local labor union to recommend employment of him to persons who had claims arising out of a tunnel explosion. Respondent appealed to the United States Supreme Court which vacated this judgment and remanded the case for further consideration in light of the decision in *Ohralik v Ohio State Bar Ass'n,* 436 US 447; 98 S Ct 1912; 56 L Ed 2d 444 (1978).[3] The Supreme Court's action in this case is an indication that we should consider the constitutional issues present in order to resolve whether the state's action in disciplining respondent violated US Const, Ams I, XIV. The Supreme Court's reference to *Ohralik* indicates that the constitutional standard employed in *Ohralik* should control this case. After reviewing *Ohralik,* and the constitutional standard applied in that case, we would hold that the suspension of respondent's privilege to practice law did not offend the Constitution[4] and reinstate the order of suspension.

---

[1] DR 2-103(A) provided:

"A lawyer shall not recommend employment, as a private practitioner, of himself, his partner, or associate to a non-lawyer who has not sought his advice regarding employment of a lawyer."

[2] DR 2-103(C) provided:

"A lawyer shall not request a person or organization to recommend employment, as a private practitioner, of himself, his partner, or associate, except that he may request referrals from a lawyer referral service operated, sponsored, or approved by a bar association representative of the general bar of the geographical area in which the association exists and may pay its fees incident thereto."

[3] See *Jaques v State Bar Grievance Administrator,* 436 US 952; 98 S Ct 3063; 57 L Ed 2d 1118 (1978).

[4] The issue on remand concerns the state's power to regulate these types of activities and whether respondent's activities were constitutionally protected. Accordingly, this opinion will not discuss other nonconstitutional issues such as the appropriateness of these disciplinary rules or whether the rules should be amended for policy reasons. See ABA Report 177B of the Board of Governors, pp 43-45 (1977), ABA, Code of Professional Responsibility (August, 1978). Also, we will

I

In *Ohralik,* two girls were involved in an automobile accident with an uninsured motorist. Ohralik, an Ohio attorney, telephoned and visited the parents of the 18-year-old driver and learned that their daughter was in the hospital. He approached the daughter in the hospital and, after a brief conversation, told her that he would represent her. He asked her to sign a representation agreement but she said she would have to discuss it with her parents. After another visit with her parents, he returned to her hospital room where she signed a contingent fee agreement. In the meantime, Ohralik approached the driver's passenger at her home on the day she was released from the hospital. He offered to represent her on a contingent fee basis and she responded "O.K." As a result of complaints filed by these two individuals, Ohralik's license to practice law was indefinitely suspended for violating DR 2-103(A) and DR 2-104(A) of the Ohio Code of Professional Responsibility.

Ohralik appealed to the United States Supreme Court claiming that his actions in soliciting these clients were constitutionally protected and indistinguishable, for the purpose of constitutional analysis, from the advertising in *Bates v State Bar of Arizona,* 433 US 350; 97 S Ct 2691; 53 L Ed 2d 810 (1977). On appeal, the Court held that "the Bar—acting with state authorization—constitutionally may discipline a lawyer for soliciting clients in person, for pecuniary gain, under circumstances likely to pose dangers that the State has a right to prevent". *Ohralik, supra,* 449. The Court reaffirmed the tenet that:

---

not reconsider the other nonconstitutional issues decided in *State Bar Grievance Administrator v Jaques,* 401 Mich 516; 258 NW2d 443 (1977).

"The States enjoy broad power to regulate 'the practice of professions within their boundaries,' and '[t]he interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been "officers of the courts." ' " *In re Primus,* 436 US 412, 422; 98 S Ct 1893; 56 L Ed 2d 417 (1978).

See *Goldfarb v Virginia State Bar,* 421 US 773, 792; 95 S Ct 2004; 44 L Ed 2d 572 (1975). However, if the exercise of these powers regulates conduct within the First Amendment's protective ambit, then such regulations must pass constitutional scrutiny.

In setting forth the appropriate standard of judicial review for this type of case, the Supreme Court carefully identified the First Amendment interests which were, and were not, present in *Ohralik.* The Court characterized the activities at issue in *Ohralik* as a "commercial transaction". The Court was careful not to discard "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to governmental regulation, and other varieties of speech". *Ohralik, supra,* 455-456. These specified "other varieties" refer to political, associational and expressional speech which are at the core of the First Amendment's protective ambit. "[The] government may regulate in the area only with narrow specificity", *NAACP v Button,* 371 US 415, 433; 83 S Ct 328; 9 L Ed 2d 405 (1963), *Primus, supra,* 424.

However, the solicitation in *Ohralik* did not involve any "political expression or an exercise of associational freedom, 'employ[ing] constitutionally privileged means of expression to secure constitutionally guaranteed civil rights' ". *Ohralik, supra,* 458. Compare *Button, supra; Primus, supra.* There-

fore, the stricter standard of judicial review warranted by those political and associational freedoms was not applicable to that case. While this did not remove such speech entirely from the protection of the First Amendment, it lowers the level of appropriate judicial scrutiny, *Ohralik, supra,* 457.

In the area of commercial speech, the most commonly recognized First Amendment interest is preserving the free flow of information, see *Bates, supra; Virginia State Board of Pharmacy v Virginia Citizens Consumer Council, Inc,* 425 US 748; 96 S Ct 1817; 48 L Ed 2d 346 (1976). In *Virginia Pharmacy, supra,* 763-765, the Court noted that not only advertisers, but also consumers and society as a whole have an interest in preserving the free flow of commercial information. The Court stated:

"As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate.

\* \* \*

"Generalizing, society also may have a strong interest in the free flow of commercial information.

\* \* \*

"It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable."

When state regulations affect these First Amendment interests, the regulations will be held unconstitutional if they do not sufficiently advance justifiable state interests, *Bates, supra.* In *Ohralik,* the appellant conceded that the state had a legitimate and compelling interest in preventing those

aspects of solicitation that involve fraud, undue influence, intimidation, overreaching[5] and other forms of vexatious conduct. The Court agreed that these were important and legitimate state interests, see *Ohralik, supra,* 462.

However, Ohralik insisted that none of those evils were actually present in his case. He argued that nothing less than actual harm would justify the disciplinary action imposed because any other standard would unnecessarily curtail the free flow of information protected by the First Amendment. The Supreme Court declined to accept this argument stating that "[t]he Rules prohibiting solicitation are prophylactic measures whose objective is the prevention of harm before it occurs", *Ohralik, supra,* 464. The Court reasoned that the state's strong interest in preventing the evils likely to result from unregulated in-person solicitation, together with the fact that it would be difficult to prove that harm actually occurred, justified the prophylactic measures. The Court held that the disciplinary rules could constitutionally be applied to appellant's conduct even without proof of actual harm.

## II

The underlying facts of the instant case as presented to this Court appear more fully in *Jaques, supra.* The specific charges upon which findings by the State Bar Grievance Board finally were based were set forth in two complaints.

---

[5] Overreaching has been defined as "aggressive competition among lawyers for clients which leads to lawyers approaching clients at times when the clients are in no condition to properly consider retention of a lawyer". Note, *Advertising, Solicitation and the Profession's Duty to Make Legal Counsel Available,* 81 Yale L J 1181, 1184, fn 23 (1972).

The first complaint[6] charged that respondent, on or about December 13, 1971, personally requested and did meet with Robert J. McLaughlin, Jr., union business agent, for the stated purpose of obtaining McLaughlin's assistance in soliciting the victims and/or survivors of a tunnel explosion. McLaughlin refused so to endorse respondent. The complaint then alleged that respondent directly and in concert with Edward Paige and/or William Rounsoville solicited or caused to be solicited personal and/or derivative claims from certain named victims and/or survivors (nine in number). DR 2-103(C), DR 2-104(A)(5) and DR 2-105(A) of the Code of Professional Responsibility and the Supreme Court Rules relating to the State Bar of Michigan.

After Wayne County Hearing Panel 17 heard six

---

[6] "That on or about December 13, 1971, respondent personally arranged to meet Robert J. McLaughlin, Jr., business agent for Local 463 of the Laborers International Union of North America and did so meet with McLaughlin on said day and date for the stated purpose of obtaining McLaughlin's assistance, as an officer of said union, in soliciting the victims and/or survivors of victims of a tunnel explosion at Port Huron occurring December 11, 1971.

"That McLaughlin personally, and as an officer of said union refused to endorse respondent as an attorney recommended to said victims and/or survivors by him or the local union.

"That thereafter, from on or about December 13, 1971 to on or about February 1, 1972, and on frequent occasions in the interim respondent, individually and in concert with Edward Paige and/or William Rounsoville solicited or caused to be solicited the personal and/or derivative claims, and/or contemplated personal and/or derivative claims of the victims and/or survivors of said victims of said explosion, to-wit:

"(1) Mrs. Johanna Laretz;

"(2) Mrs. Maddelin Williams; [sic]

"(3) Mrs. Rose Woolstenhulme;

"(4) Mrs. Sue Curtis;

"(5) Mrs. Maggie Epperson;

"(6) Mrs. Judy A. Hardel;

"(7) Francis M. Hamricks;

"(8) Olin Hamricks, Jr.; and

"(9) Joyce Simkins (Mrs.)

"That the foregoing violated Code of Professional Responsibility DR 2-103(C); DR 2-104(A)(5); and DR 2-105(A) and the Supreme Court Rules relating to the State Bar of Michigan."

witnesses, including Mrs. Rose Woolstenhulme, whom respondent allegedly personally solicited at her home after she had lost a husband and grandson in the explosion, and including William Rounsoville, union steward, who allegedly was solicited for recommendations of respondent to survivors/ victims of the explosion, Mr. Jaques offered to plead nolo contendere to charges amended by stipulation. The plea was accepted and a one-year suspension from practice was ordered.

However, the State Bar Grievance Board set aside the plea and remanded to Panel 17 for hearing the testimony to conclusion. Prior to this order a second formal complaint was filed. It[7] alleged that on or about December 15, 1971, respondent met with McLaughlin and volunteered advice to him to bring a lawsuit on behalf of the union in order to bring about inquiry into the causes of the explosion. It further alleged that respondent sought to persuade McLaughlin to solicit and/or seek out survivors and next of kin of deceased victims for the purpose of employing respondent as their attorney. DR 2-103, subds (A) and (C) of the Code of Professional Responsibility

---

[7] "That on or about December 15, 1971, respondent met with Robert J. McLaughlin, business agent of Local 463 of the Laborers Union at Port Huron, Michigan, and did, then and there:

"(a) Volunteered advice to said McLaughlin to bring a lawsuit or lawsuits on behalf of said union for the purpose of precipitating an inquiry into the causes of an explosion in a tunnel being constructed in the vicinity in which members of said union were employed at the time of said explosion;

"(b) Sought to persuade said McLaughlin to act on behalf of respondent to solicit and/or seek out survivors of said explosion and/or next of kin of victims of said explosion for the purpose of employing respondent as their attorney to prosecute any and all compensation or personal injury claims of said victims and/or their next of kin.

"That said conduct is in violation of former Canon 28 of the Canons of Professional Ethics, Canon 2, DR 2-103(A) and (C) of the Code of Professional Responsibility and Rule 15, § 2, [subds] (2), (3), and (4) of the Supreme Court Rules relating to the State Bar of Michigan."

and Rule 15, §§ 2(2), 2(3), and 2(4) of the Supreme Court Rules governing the State Bar of Michigan.

The board thereafter ordered the two complaints consolidated and heard. Panel 17 then disqualified itself as did Panel 12. The case eventually was heard by Panel 2 which made four findings[8] and ordered discipline which was modified by the board only as to the amount of costs.

Because only three of the original six witnesses personally appeared, Panel 2 read the transcript of the earlier truncated hearing before Panel 17 and then took ten more days of testimony.

Our Court found that it was error for Panel 2 to have relied upon the earlier transcript. Eliminating that part of the record caused a failure of evidentiary support for findings concerning the personal solicitation of the widow Woolstenhulme and also of the union steward Rounsoville for recommendations to survivors, and others.

We affirmed the remainder of the findings, saying:

"In view of the foregoing we conclude that the findings that Mr. Jaques violated DR 2-103(A) and DR 2-103(C) by personally soliciting McLaughlin and members of the local laborer's union to join in a class action

[8] "I. That Mr. Jaques personally solicited the local laborer's union and some of its members to join in a class action Mr. Jaques was planning to file to compel the Coast Guard to investigate the tunnel explosion, in violation of DR 2-103(A) and DR 2-103(C). See also DR 2-104(A)(5).

"II. That Mr. Jaques requested the agent for the local union, Robert J. McLaughlin, to recommend him to persons who had claims arising out of the explosion. DR 2-103(C) prohibits a lawyer from requesting another to recommend his employment.

"III. That Mr. Jaques visited the home of Mrs. Rose Woolstenhulme, whose husband and grandson died in the explosion, and requested to be employed to represent her in violation of DR 2-103(A).

"IV. That Mr. Jaques requested William Rounsoville, steward of the local laborer's union, to recommend him to survivors of victims of the tunnel explosion, violating DR 2-103(C)." 401 Mich 531-532.

he was planning to file, and DR 2-103(C) by requesting McLaughlin, the agent for the local union, to recommend him to persons who had claims arising out of the tunnel explosion, heretofore described as Grievance Board findings I and II respectively, are supported by substantial evidence in the record.

"As indicated, we reverse Grievance Board findings III and IV, the alleged solicitation of Rose Woolstenhulme and the alleged request of William Rounsoville to recommend Jaques to survivors of explosion victims.

*   *   *

"The kind of solicitation involved in this case remains the classic example of the public conception of 'ambulance chasing' which not only exposes the profession to public contempt, but unjustly exposes its thousands of innocent individual members to concomitant derision and contempt despite their steady allegiance to ethical norms and professional self-discipline." *Jaques, supra,* 543-544.

We also modified the discipline from a three-year suspension from practice to 24 months. On remand, respondent claims that this disciplinary action must be dismissed because his activities were constitutionally protected and because the facts of this case are not within the narrow holding in *Ohralik, supra.*

## A

The constitutional standard governing the regulation of this type of commercial activity provided in *Ohralik* also governs this case. Like Ohralik, see *Ohralik, supra,* 458, respondent does not claim that his conduct involved any political expression or the exercise of an associational freedom in an effort to secure constitutionally protected rights. Therefore, the more stringent constitutional standards employed when these interests are present, see *Primus, supra; Button, supra,* do not apply in

this case. In the context of commercial speech, *Bates, supra,* and *Virginia Pharmacy, supra,* established that a state cannot constitutionally curtail the free flow of information by regulation without advancing a justifiable countervailing state interest.

Respondent claims that his conduct provided potential clients with information about their legal rights and remedies and the availability and terms of his legal services. He argues that the disciplinary rules unjustifiably curtail the free flow of this commercial information. However, applying the rules in this case will not necessarily curtail the free flow of this information. The rules do not prohibit respondent from communicating information to people about their legal rights and remedies or recommending that they obtain counsel. The rules only prohibit a lawyer from recommending employment of himself and requesting others to do so. In this respect, the rules are similar to DR 2-104(A). In holding that DR 2-104(A) did not unconstitutionally curtail the free flow of information, the Supreme Court stated, "[t]he Rule does not prohibit a lawyer from giving unsolicited legal advice; it proscribes the acceptance of employment resulting from such advice". *Ohralik, supra,* 458.

*B*

On the other hand, the state's interests in regulating solicitation by attorneys are particularly strong. In addition to the state's general interest in protecting consumers, the state bears a special responsibility for maintaining standards among members of its licensed professions. Some of the substantive evils sought to be prevented by the regulations prohibiting solicitation include: stirring up litigation, assertion of fraudulent claims,

debasing the legal profession, and potential harm to the prospective client due to overreaching, undue influence and invasions of privacy, see *Ohralik, supra,* 461. These legitimate interests justify regulations prohibiting solicitation in circumstances where harm is likely to occur, and as a constitutional matter, the absence of any proof or finding of harm in any particular case is immaterial, see *Ohralik, supra,* 468.

### III

When determining whether the state can constitutionally impose discipline in this case, the appropriate focus is on respondent's conduct, see *Ohralik, supra,* 463.[9] In distinguishing *Ohralik,* and in support of his constitutional claims, respondent argues that (1) he did not solicit any potential clients in person, (2) his conduct did not create any circumstances likely to present dangers that a state has a right to prevent, and (3) he was not acting for pecuniary gain. Respondent argues that these factors distinguish his conduct from that present in *Ohralik* and that because this case is not within the narrow holding of *Ohralik,* discipline cannot constitutionally be imposed.

Contrary to respondent's interpretation of *Ohralik,* we find that *Ohralik* does not represent the only situation in which a state can constitutionally discipline an attorney for solicitation. *Ohralik* and *Primus* have been described as the opposite poles of the attorney solicitation problem, see *Ohralik,*

[9] In attacking the constitutionality of the disciplinary rules, respondent does not rely on the overbreadth doctrine. Nor does it appear that such an argument would prevail, see *Ohralik v Ohio State Bar Ass'n,* 436 US 447, 462, fn 20; 98 S Ct 1912; 56 L Ed 2d 444 (1978), *Bates v State Bar of Arizona,* 433 US 350, 380; 97 S Ct 2691; 53 L Ed 2d 810 (1977). Respondent contends that the rules can not constitutionally be applied to him.

*supra,* 469 (opinion of Marshall, J.). Whether the
Constitution permits or prohibits the regulation of
solicitation in situations falling between the two
extremes of *Ohralik* and *Primus* does not depend
solely on whether the factual situation in the case
in question is identical to the facts presented in
the extreme cases. It depends on how the stan-
dards applied in those cases and the considerations
underlying those standards apply to the case in
question.

## A

Respondent contends that this case is distin-
guishable from *Ohralik* because he did not solicit
any potential clients in person (as confined to
findings regarding Counts I and II). He refers to
the fact that there were no victims, or survivors of
victims, at the meeting, see *Jaques, supra,* 539.
However, Father Maggioni, who represented the
families of two of the victims, was present at the
meeting. McLaughlin and several members of the
local union were also present. It was the personal
solicitation of these latter persons which was, in
part, the basis of the board's finding of violation of
DR 2-103(A).

Respondent's actions in requesting McLaughlin
to recommend him to others who had claims aris-
ing from the explosion did not involve any direct
in-person solicitation by an attorney. McLaughlin
was not a potential client and he did not solicit
any potential clients on respondent's behalf. Re-
spondent claims that the absence of any Michigan
Supreme Court findings with respect to in-person
solicitation renders this case distinguishable from
*Ohralik* and indistinguishable from *Bates, supra.*
While the absence of any in-person solicitation of
potential clients by an attorney does distinguish

this case from *Ohralik* it does not necessarily require a different result. The gravamen of this complaint against respondent was that he requested another person to recommend employment of him to potential clients in violation of DR 2-103(C).[10]

The use of another person as an intermediary to solicit potential clients may pose dangers as substantial as soliciting them directly. The relative magnitude of these potential dangers depends on the facts present in each case. It can vary depending on the intermediary chosen and the actions taken by the intermediary. The use of some intermediaries may reduce the potential for overreaching present when an attorney solicits clients in person,[11] but there is nothing inherent in the use of a personal intermediary which will necessarily remove the possibility of overreaching, undue influence, and invasion of privacy that the state has a right to prevent.

The potential for overreaching or undue influence is substantial when the intermediary solicits the potential client in person. The intermediary may also be a professional, such as a salesperson, trained in the art of persuasion.[12] Such in-person solicitation, like in-person solicitation by an attorney, "may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection", *Ohralik, supra,*

---

[10] McLaughlin testified that respondent told him in regard to respondent's business cards that he could "meet with my people" and pass the cards out, "my people" being the surviving family members of the deceased laborers, see *Jaques, supra,* 542.

[11] For example, DR 2-103(C)(1) permits attorneys to request referrals from a lawyer reference service operated or approved by a bar association.

[12] The Federal Trade Commission has recognized that face-to-face selling techniques may have detrimental aspects even when ordinary consumer products are the only items involved, see 16 CFR §§ 429.1 *et seq.;* see, also, *Ohralik, supra,* 464-465, fn 23.

457. It is the presence of these factors which distinguishes this conduct from the advertising in *Bates, supra,* which simply provides access to "information and leaves the recipient free to act upon it or not", see *Ohralik, supra,* 457.

The use of an intermediary who is not an attorney to solicit potential clients may also present other risks. The nonlawyer intermediary may be more likely to misstate the applicable law or the client's legal remedies, either through inadvertence or ignorance or on purpose, in attempting to persuade the client to employ a specific attorney.[13] The intermediary may even attempt more extreme, less ethical conduct than an attorney might use in soliciting clients because a nonlawyer intermediary might not feel bound to adhere to the standards incorporated into the Code of Professional Responsibility.[14]

The use of personal intermediaries to recommend employment also would signficantly increase the likelihood that the privacy of potential clients would be invaded. Allowing the use of intermediaries would increase the number of potential clients with whom an attorney could communicate. Moreover, once certain attorneys employed intermediaries, others might feel compelled to respond by also

[13] The use of nonlawyers as intermediaries can present potential for harm even if all their attempts at solicitation fail. Not only is the privacy of individuals likely to be invaded but also there is a danger that the solicitee might be misled by some statements of the intermediary. Unless the intermediary is knowledgeable of the applicable laws and available remedies, he may through inadvertence inaccurately advise the potential client. Relying on this information, a person might forego an available remedy or take some action which is not in his best interest. The dangers presented by this situation are the greatest when the solicitee decides not to consult an attorney. In these situations, the dangers resulting from any inaccurate information may go unchecked.

[14] See ABA, Code of Professional Responsibility, Canon 3, Ethical Consideration 3-3.

using intermediaries. The privacy of all individuals would be likely to suffer as a result.

Finally, the potential for all these harms increases if the intermediary has or perceives that he might have an interest in successfully soliciting clients.[15]

For these reasons, we conclude that the use of intermediaries is just as likely to pose dangers that the state has a right to prevent as direct in-person solicitation by an attorney. The United States Supreme Court recognized that the use of intermediaries, or runners, presents problems similar to those presented by direct solicitation, see *Ohralik, supra,* 464, fn 22. Therefore, we find that the fact that respondent requested another to solicit potential clients, instead of soliciting them himself, does not necessarily distinguish this case from *Ohralik.*

*B*

Respondent also argues that this case is distinguishable from *Ohralik* because his conduct did not involve "circumstances likely to pose dangers that the State has a right to prevent". He argues that his activities in requesting the union agent to recommend him were constitutionally protected and that the rules impermissibly impinge on the associational rights of the union members. The Supreme Court has ruled that workers have a constitutional right "to gather together for the lawful purpose of helping and advising one another" in asserting Federal rights, *Brotherhood of Railroad Trainmen v Virginia State Bar,* 377 US 1,

---

[15] Not only does the presence of a pecuniary motive on behalf of the soliciting intermediary increase the potential for the abuses mentioned above, but it also might give the solicitor a motive for stirring up litigation or encouraging people to file fraudulent claims.

5; 84 S Ct 1113; .12 L Ed 2d 89 (1964), and that groups can unite together to assert their legal rights as effectively and economically as practical, *United Transportation Union v State Bar of Michigan,* 401 US 576, 580; 91 S Ct 1076; 28 L Ed 2d 339 (1971). In *United Transportation, supra,* the Court held that a state may not enjoin members of a union from banding together to gain advice on their legal rights or enjoin a union from recommending selected attorneys to its members. Respondent argues that the premise underlying these decisions is that the union agents will become familiar with and acquire an expertise in recommending attorneys for their members through repeated experiences in this area and, thereby, assist their members in making informed decisions in obtaining counsel. Respondent claims that his conduct in informing the union agent of his availability serves the same function as the advertising in *Bates, supra,* and allows the union to make an "informed" recommendation. He argues that the union agent will become sufficiently familiar with the problems of legal referral only if attorneys are allowed to contact and advise him and that, once so advised, the union agent will have sufficient expertise to evaluate the different attorneys' statements and claims. Therefore, he contends that his conduct with respect to the union agent did not create any dangers of overreaching or undue influence since any requests for employment are evaluated by the union agent before being conveyed to the potential clients.

Recognizing that unions can fulfill a valuable and important function in assisting their members to gain access to and in compiling information on the availability of legal assistance, the application

of these disciplinary rules to respondent's conduct will not hinder or diminish the ability of the union to fulfill this function. The disciplinary rules apply to attorneys; they do not directly apply to the union or its members. The rules do not prevent the union from seeking advice from attorneys on behalf of its members. The rules do not proscribe the union from recommending an attorney to its members.[16] The rules do not even prevent an attorney from giving unsolicited legal advice to a union or its members. In the context of the instant case, the rules proscribe an attorney from seeking out a union and requesting that the union recommend employment of him to its members. The application of this rule to respondent's conduct will not diminish the ability of the workers to associate together in furtherance of a legal purpose. The rule does not undermine the workers' ability to engage in collective activity undertaken to obtain meaningful access to the courts.[17] Therefore, we decline to accept respondent's claim that his conduct did not create circumstances likely to pose dangers that a state has a right to prevent. The fact that he initiated the meeting with the union agent and others did not destroy the state's right to prevent the harms which are likely to result from this type of conduct.

## C

Respondent also contends that the disciplinary

---

[16] See ABA Committee on Ethics and Professional Responsibility, Informal Opinion No 1298 (November 12, 1974).

[17] Applying the rule to this type of conduct will not diminish the union's access to information concerning legal rights and remedies. When the union desires to assist its members in obtaining legal representation it may contact and discuss its situation with as many attorneys as it deems appropriate. Ideally, the union would contact a sufficient number of attorneys to permit it to make an informed decision or recommendation. There is no showing that prohibiting an attorney from contacting the union and recommending employment of himself will diminish the union's ability, compare *NAACP v Button,* 371 US 415; 83 S Ct 328; 9 L Ed 2d 405 (1963).

rules cannot constitutionally be applied in this case because he was not acting for pecuniary gain. In soliciting potential clients for the proposed class action, respondent stated that no fees were to be charged in connection with bringing this suit. He argues that since he had no pecuniary interest in soliciting these clients, it was less likely that he would take any advantage of them. Therefore, his actions did not pose any danger of harm that the state had a right to prevent. This argument does not apply to the board's finding that respondent requested McLaughlin to recommend employment of him to the survivors of the deceased victims. Respondent does not claim that he was going to represent these people free of charge in connection with their suits for damages.

In *Ohralik, supra,* 461, fn 19, the Court noted that the presence of a pecuniary motive in attorney solicitation cases creates special conflict of interest problems. While the presence of a pecuniary motive certainly increases the dangers presented by in-person solicitation, the fact that some services are offered free of charge does not necessarily guarantee the absence of a pecuniary motive or eliminate the dangers of overreaching, undue influence or invasion of privacy. One may have a pecuniary motive, or perceive a pecuniary interest, even though no fee is being charged for the immediate service. In the context of the instant case, an attorney may perceive that by prevailing in the initial investigation suit, he may induce others, especially those who joined in the investigation suit, to retain him to represent them in later suits for damages for which a fee will be charged. Also, it is possible for an attorney to perceive that success in his present client's suit for damages (and, hence, his contingent fee from that client)

depends upon persuading others to join in this initial investigation suit. Thus, an attorney may have, or perceive that he has, a pecuniary interest in a case even though no fees are charged for the first phase. Also, money is not the only consideration which motivates people. The desire for publicity or exposure could also motivate an attorney to solicit clients for a case for which no fee would be charged. As Justice Rehnquist noted in another context, "A State may reasonably fear that a lawyer's desire to resolve 'substantial civil liberties questions,' may occasionally take precedence over his duty to advance the interests of his client." *In re Primus, supra,* 445. (Citation omitted.)

Accordingly, we conclude that the absence of an immediate apparent pecuniary interest is not necessarily determinative of this issue. Even where no such interest is apparent, the possibility of future interests or a combination of other factors may supply an equivalent motive, see ABA Committee on Professional Ethics and Grievances, Formal Opinion No 169 (February 13, 1937), Informal Opinions Nos 99, 100, 101 (unpublished opinions, see ABA, Opinions of the Committee on Professional Ethics [1967 ed], pp 111-112), see also, ABA Committee on Professional Ethics, Informal Opinion No 970 (November 23, 1966).

Furthermore, it is difficult to prove an attorney's state of mind or motives during these transactions.[18] Therefore, the efficacy of the state's efforts to reduce the possibility of the evils which can result from solicitation by attorneys would be significantly reduced if the state, having proven solicitation in circumstances likely to present

---

[18] In this case, for example, there were no findings that respondent did or did not have a pecuniary motive for soliciting the potential clients to join the class action seeking an investigation, see *Jaques, supra,* 553 (opinion by LEVIN, J.).

harm, must also prove that the solicitor has a pecuniary motive. For these reasons, we conclude that the respondent has failed to show that his conduct did not create circumstances likely to pose dangers that the state has a right to prevent merely by showing that his present investigatory services were offered free of charge. If respondent had no motive for accepting this employment other than desiring to help the victims and others, it is more likely that he would have recommended that they retain another attorney rather than recommend himself and request others to recommend him. Nor would it have been deemed necessary to demonstrate his success in obtaining high verdicts or to display his newspaper clippings.

## IV

In summary, we conclude that applying DR 2-103(A) and DR 2-103(C) to prohibit this type of commercial activity will not unjustifiably curtail the free flow of information. DR 2-103(A) and DR 2-103(C) do not prohibit the giving of unsolicited legal advice. They prohibit an attorney from recommending employment of himself and requesting others to recommend him. Applying the rule to this type of conduct will not undermine the union's ability to engage in collective activity undertaken to obtain meaningful access to the courts. These prophylactic measures reflect substantial state interests in preventing solicitation in circumstances where harm is likely to occur. The respondent's activities created a potential for harm which justified, as a constitutional matter, the application of these regulations in furtherance of the state's interests even in the absence of proof or

a finding of actual harm.[19] The application of these disciplinary rules to respondent's conduct did not offend the Constitution, US Const, Ams I, XIV. Accordingly, we would reinstate the Grievance Board's order suspending respondent's privilege to practice law as modified in *Jaques, supra,* 544.

WILLIAMS, J., concurred with COLEMAN, C.J.

---

[19] There was no finding that harm actually occurred as a result of respondent's conduct but this is only because McLaughlin refused to recommend the employment of respondent to the survivors of the victims.